# United States Court of Appeals
## For the First Circuit

No. 05-9012

IN RE: OLYMPIC MILLS CORPORATION, d/b/a/ OLYMPIC GROUP,
and COACHMAN INCORPORATED,

Debtors.

DCC OPERATING, INC.,

Plaintiff, Appellee.

v.

LUIS RIVERA SIACA, ENERY ORTIZ-RIVERA,
and CONJUGAL PARTNERSHIP,

Defendants, Appellants,

v.

WAYNE S. FOREN,

Third-Party Defendant.

OLYMPIC MILLS CORPORATION, d/b/a/ OLYMPIC MILLS GROUP,
and COACHMAN INCORPORATED,

Intervenors.

APPEAL FROM THE BANKRUPTCY APPELLATE PANEL
FOR THE FIRST CIRCUIT

Before

Selya and Howard, <u>Circuit Judges</u>,
and Smith,[*] <u>District Judge</u>.

---

[*] Of the District of Rhode Island, sitting by designation.

_____

Daniel E. Rosenfeld, with whom Kirkpatrick & Lockhart LLP was on brief, for appellants.

W. Steven Paleos, with whom Carmen D. Conde, Sarit Zeevi, and C. Conde & Assoc. were on brief, for appellee.

_____

January 17, 2007

_____

**SMITH**, <u>District Judge</u>.  Defendant-appellant Luis Rivera Siaca ("Rivera") appeals a decision of the Bankruptcy Appellate Panel ("BAP") subjecting him to over $3 million in liability for retaining payments in breach of trust.  The progenitor of this procedural gem, plaintiff-appellee DCC Operating, Inc. ("DCC"), originally brought suit in diversity in the United States District Court for the District of Puerto Rico.  After obtaining a favorable summary judgment ruling, nondiverse debtors-in-possession Coachman, Inc. ("Coachman"), and its wholly-owned subsidiary Olympic Mills Corp. ("Olympic Mills"), intervened, requesting that the case be referred to the United States Bankruptcy Court for the District of Puerto Rico.  Digesting the issue for several months, the district court eventually referred the case to the bankruptcy court, which, over a year later, awarded damages and entered final judgment. Rivera appealed the unfavorable ruling to the BAP; unsuccessful there as well, he appealed to us.

Before we reach the merits of this appeal, we must cut through a factual and procedural knot of Gordian complexity.  This task calls upon us to examine at the outset whether we have subject-matter jurisdiction or if it was destroyed by the intervention of nondiverse intervenors; in turn, whether the intervenors are indispensable; and ultimately, whether remand would be appropriate to sort all this out.  We cut the knot by stepping forward to address these issues without remand.  Once the

-3-

procedural issues are resolved we move to the merits, which by comparison present a fairly straightforward issue for resolution. After careful review, we affirm.

## I.    BACKGROUND

### A.    The Hampshire Venture.

This contract dispute began with a $2 million bridge loan essentially to finance the acquisition of sweaters.[1]  The lender, Development Capital Ventures, LP ("DCV"), is an investment company that provides venture capital to small businesses.  The borrower, now-defunct Coachman, was a small business operating in Puerto Rico.  In connection with the bridge loan, which was to be made in two $1 million installments (one on February 25, 2000, the other on March 10, 2000), Coachman delivered to DCV a "CONVERTIBLE SUBORDINATED DEMAND NOTE" (the "Note") on February 24, 2000.  The Note had a maturity date of June 30, 2000,[2] and provided for the conversion of the principal amount into company stock at DCV's option at any time before the balance was paid in full, or automatically upon the satisfaction of certain conditions.

The Note identified, described, and attached as annexes four documents that bore upon the bridge loan.  Annex A was a term

---

[1] A bridge loan, also known as a swing loan, is a short-term high-interest loan to finance a discrete, typically time-sensitive, project or venture.

[2] An amendment to the Note extended the maturity date to January 31, 2001, and increased the principal amount to $2.5 million.

sheet detailing the conversion of stock; it, along with a guaranty embodied in annex C, is not involved in this dispute. Annex B was a document entitled "ASSET PURCHASE AGREEMENT," which the Note identified as the "Hampshire Agreement" and defined in ¶ 1.(viii) as follows:

> **"Hampshire Agreement"** shall mean the agreement between the Company [Coachman] and Hampshire Corporation (**"Hampshire"**) whereby the Company establishes a subsidiary to acquire inventory and equipment from Hampshire and Hampshire guarantees to acquire a minimum of 12 million sweaters from such subsidiary over the next five (5) years, or an average annual purchase of 2.4 million sweater units. See draft agreement under <u>Annex B</u>.

The draft version of the Hampshire Agreement identified the "subsidiary" referenced above as Glamourette/OM, Inc. ("Glamourette").[3] The last document attached to the Note (as annex D) was a "SUBORDINATION AND STANDBY AGREEMENT" (the "Subordination Agreement"). According to the terms of the Note, Rivera, Coachman's affluent chairman and sometimes lender, was required to execute the Subordination Agreement as a condition precedent to the bridge loan.

Rivera executed the Subordination Agreement, along with the Note (on behalf of Coachman), on February 24, 2000. At that time, Coachman owed Rivera approximately $5.75 million on past loans, but neither the Note nor the Subordination Agreement

---

[3] The record reflects that, at some point after January 24, 2000, the entity's name was changed to Glamourette/OG, Inc.

-5-

identified the particular loans to be subordinated to DCV's bridge loan. Almost a year later, Coachman fell into default. DCV's corporate general partner, DCC, demanded that Coachman pay its balance. When Coachman took no action to satisfy its obligations under the Note, DCC demanded that Rivera pay all amounts due from payments he had received from Coachman or its affiliates over the previous year. (Between February 24, 2000, and October 18, 2001, Rivera made a series of loans to Coachman, Olympic Mills, and Glamourette totaling $16.6 million, and was repaid at least $5.6 million.) On November 7, 2001, DCC, alleging various state-law claims under the Subordination Agreement, sued Rivera in diversity in federal district court. Shortly thereafter, on November 26, 2001, Coachman, Olympic Mills, and Glamourette filed in bankruptcy court voluntary petitions for relief under Chapter 11.[4]

**B. The Litigation**.

Discovery proceeded in district court for almost a year before DCC and Rivera filed cross-motions for summary judgment. DCC argued that Rivera violated his trust obligations under the Subordination Agreement by retaining certain payments from Coachman or its affiliates. Specifically, DCC contended that, pursuant to ¶ 4 of the Subordination Agreement, Rivera was required to forward

---

[4] The separately-filed bankruptcy petitions were consolidated within a week. On December 19, 2002, the bankruptcy court granted Glamourette's motion for conversion to chapter 7 liquidation; Coachman and Olympic Mills followed suit on May 4, 2004.

such payments to DCV for application against the bridge loan. Rivera responded that the Subordination Agreement covered only those loans made before January 24, 2000. The disbursements he had received, Rivera explained, were in payment of loans made after the execution of the Subordination Agreement. The district court disagreed and ruled that the Subordination Agreement unambiguously covered the repayment of all loans, whenever made, until Coachman satisfied its obligations under the Note. However, the district court reserved decision on the amount of damages hoping that, in light of its ruling, the parties would reach an agreement on their own. The district court entered partial summary judgment on December 16, 2002.

Nine days later, Rivera moved to dismiss the case for failure to join Coachman and Olympic Mills. Rivera argued, for the first time, that these parties were necessary, indispensable, and (importantly) nondiverse by virtue of their incorporation in Delaware. (DCC was a Delaware corporation as well.) The next day, Coachman and Olympic Mills filed in the district court through special counsel a motion to intervene as of right under Fed. R. Civ. P. 24(a)(2). Citing DCC's recent victory, Coachman and Olympic Mills argued, without actually asserting any claim, that the payments to Rivera "may be subject to the avoidance powers" granted to them as debtors-in-possession. Because their interest in these payments "may preempt" that of DCC, and because "DCC's

attempt to collect the funds for its own benefit implicate[s] numerous core bankruptcy issues," Coachman and Olympic Mills requested that the case be referred to the bankruptcy court for further adjudication. In a text order entered on December 31, 2002, the district court granted the motion to intervene without discussion (and without addressing Rivera's motion or soliciting DCC's position on either motion), and ordered the parties to appear at a status conference on January 16, 2003, to address the intervenors' referral request. DCC filed a motion opposing dismissal, intervention, and referral on January 15.

At the status conference, DCC said that it would consent to referral only if Rivera would deposit over $5 million with the bankruptcy court. The district court gave Rivera until January 24 to respond, set a briefing schedule on the referral question if Rivera declined DCC's offer (which he did), and stated that the case would proceed to trial on May 27, 2003 if the case were not referred. Coachman and Olympic Mills submitted a memorandum on February 24 pursuant to the scheduling order, but, short-circuiting the process, initiated an adversarial proceeding (No. 03-0042) in bankruptcy court the very next day. The complaint, filed against Rivera, DCC, DCV, and others, alleged a variety of claims, including preferential payments and fraudulent conveyances.

The referral remained under advisement in the district court for the next two months. With a trial date approaching, the

district court finally referred the parties' contract dispute to the bankruptcy court on May 1, 2003. (Taking care of old business, the district court also denied as moot Rivera's January request to file another indispensability memo.) The case proceeded in bankruptcy court as a separate adversary proceeding (No. 03-0090), despite Rivera's motion in adversary proceeding No. 03-0042 to consolidate them. DCC moved to dismiss Coachman and Olympic Mills as intervenors, but the bankruptcy court denied the motion without discussion in a text order on February 12, 2004. After some additional discovery, DCC and Rivera filed cross-motions for summary judgment. Ruling upon the motions in August 2004, the bankruptcy court, recognizing that the "sole remaining issue" was the amount of damages DCC should receive, rejected Rivera's call to vacate the district court's previous ruling on liability.[5] Calculating the appropriate figure, the bankruptcy court granted DCC's motion, denied Rivera's, and, several days later, entered final judgment pursuant to Fed. R. Civ. P. 54(b).

Rivera timely appealed to the BAP, which, after a thorough examination of its authority to review interlocutory orders of the district court,[6] affirmed. Luis Rivera Siaca v. DCC

---

[5] Rivera made the same argument in adversary proceeding No. 03-0042, with the same result.

[6] Judge Arthur N. Volotato dissented from the majority's decision to review the district court's interlocutory order granting partial summary judgment, arguing that, under our opinion in Brandt v. Wand Partners, 242 F.3d 6, 13-15 (1st Cir. 2001),

Operating, Inc. (In re Olympic Mills Corp.), 333 B.R. 540 (1st Cir. B.A.P. 2005).  This appeal ensued.

## II.  DISCUSSION

### A.    Subject-Matter Jurisdiction.

Before addressing the merits, we must deal with the procedural tangle and determine if we have jurisdiction, even though the parties did not originally contest our jurisdiction on appeal.  See Doyle v. Huntress, Inc., 419 F.3d 3, 6 (1st Cir. 2005) (holding that, even where subject-matter jurisdiction may go unchallenged on appeal, "we have an obligation to inquire sua sponte into our jurisdiction over the matter").  Indicating at oral argument that the integrity of complete diversity in this case was a matter of primary importance, we permitted the parties to submit supplemental briefing on whether the intervention of Coachman and Olympic Mills divested the district court of diversity jurisdiction.  We now conclude that it did not.

**1.    Complete Diversity**.  The district courts of the United States are "courts of limited jurisdiction.  They possess only that power authorized by Constitution and statute."  Kokkonen v. Guardian Life Ins. Co. Of Am., 511 U.S. 375, 377 (1994).  In 28

---

neither the BAP nor the bankruptcy court possessed the jurisdiction to do so.  We take no position generally on the BAP's authority to review interlocutory orders of the district court, but assume, for the limited purpose of deciding this rather complicated appeal, that the BAP's ruling in this respect is appropriate.

U.S.C. § 1332, the sole basis for jurisdiction in this case,[7] Congress bestowed upon the district courts original jurisdiction in civil actions between citizens of different states. The diversity requirement of § 1332 must be complete. In cases involving multiple plaintiffs or defendants, the presence of but one nondiverse party divests the district court of original jurisdiction over the entire action. See Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267, 267 (1806).

The complete-diversity rule is not a constitutional requirement, see State Farm Fire & Casualty Co. v. Tashire, 386 U.S. 523, 530-31 (1967), or even explicitly required by the

---

[7] DCC's argument that the district court's original jurisdiction continued uninterrupted from diversity of citizenship to bankruptcy jurisdiction is unsupported and mischaracterizes the circumstances of this case. The theory appears to rely on the tortured application of a limited exception to the complete-diversity rule when a plaintiff joins a nondiverse defendant sued under federal law with a diverse defendant sued in diversity. See Romero v. Int'l Terminal Operating Co., 358 U.S. 354, 381 (1959) ("Since the Jones Act provides an independent basis of federal jurisdiction over the non-diverse respondent . . . the rule of Strawbridge v. Curtiss . . . does not require dismissal of the claims against the diverse respondents."). The exception recognizes and attempts to ameliorate the "anomaly that would be created by 'not allowing a plaintiff to do in one federal suit what he would be entitled to do in two separate federal suits.'" Hiram Walker & Sons, Inc., v. Kirk Line, 877 F.2d 1508, 1512 (11th Cir. 1989) (quoting Baker v. J.C. Penney Co., 496 F. Supp. 922, 924 (N.D. Ga. 1980)). The present case is clearly distinguishable because, at the commencement of the case, there was no independent basis of original federal jurisdiction that DCC could have invoked to bring suit against Coachman or Olympic Mills (nondiverse parties) on its state-law contract claims under the Subordination Agreement while, at the same time, bringing suit against Rivera (a diverse party) in diversity.

-11-

governing statute, see § 1332, but it is nonetheless strictly construed. Acton Co., Inc. of Mass. v. Bachman Foods, Inc., 668 F.2d 76, 79 (1st Cir. 1982). History is in part responsible both for the rule's genesis and its rigid application. The historic primary function of the diversity requirement was "to provide a 'neutral' forum for the out-of-state litigant who fears that the state court may be unduly, if unconsciously and inarticulately, solicitous for the interests of its own citizens." Caso v. Lafayette Radio Elecs. Corp., 370 F.2d 707, 710 (1st Cir. 1966). The presence of a nondiverse party eliminates this concern over litigating in the state court. See Wis. Dept. of Corr. v. Schacht, 524 U.S. 381, 389 (1998).

The rule is most inflexibly applied at the time of filing, for it has long been settled that "the jurisdiction of the court depends upon the state of things at the time of the action brought." Grupo Dataflux v. Atlas Global Group, L.P., 541 U.S. 567, 570 (2004) (quoting Mollan v. Torrance, 22 U.S. (9 Wheat.) 537, 539 (1824)). The postfiling context is more elastic because, as a general matter, "if jurisdiction exists at the time an action is commenced, such jurisdiction may not be divested by subsequent events." Freeport-McMoRan, Inc. v. K N Energy, Inc., 498 U.S. 426, 428 (1991) (per curiam) (involving substitution under Fed. R. Civ. P. 25(c)). There are exceptions, however: the postfiling introduction of a nondiverse party may, in certain circumstances,

spoil the jurisdiction that obtained when the suit commenced.  For example, in Am. Fiber & Finishing, Inc. v. Tyco Healthcare Group, LP, 362 F.3d 136, 139 (1st Cir. 2004), we read Freeport-McMoRan to apply in the context of postfiling transfers of interest under Rule 25, but not in the postfiling addition of a nondiverse party under Fed. R. Civ. P. 15(a).  See also Casas Office Machs., Inc. v. Mita Copystar Am., Inc., 42 F.3d 668, 674 (1st Cir. 1994) (substitution of dispensable nondiverse defendants for fictitious defendants destroyed diversity jurisdiction).  Yet the rule championed in Freeport-McMoRan is one of general application, as we have observed.  Whether intervention under Rule 24(a) fits this mold is the question to which we now turn.

We are mindful of our remark, in B. Fernandez & Hnos., Inc. v. Kellogg USA, Inc., 440 F.3d 541 (1st Cir. 2006), that the addition of a nondiverse intervenor as of right divested the district court of diversity jurisdiction.  At the puerile stages of the litigation in Kellogg, a nondiverse company, Kellogg Caribbean Services, Inc. ("Kellogg Caribbean"), appealed the district court's denial of its motion to intervene as of right as a defendant.  Kellogg Caribbean argued that it, not Kellogg USA, Inc. ("Kellogg USA" — the original diverse defendant), was the proper defendant to the litigation because Kellogg USA previously had assigned its rights and obligations under the disputed contract to Kellogg Caribbean.  We began by framing the inquiry:

-13-

> [F]ederal jurisdiction is premised on the diversity of citizenship between Kellogg USA (a Michigan company) and [B. Fernandez & Hnos.] and [Carribean Warehouse Logistics] (Puerto Rico companies). But, if Kellogg Caribbean (a Puerto Rico company) is entitled to intervene as a matter of right under Rule 24(a)(2) and is an indispensable party under Rule 19(b), the litigation must be dismissed because there would not be complete diversity.

Kellogg, 440 F.3d at 544. Tackling the intervention issue first, we concluded that the nondiverse company had satisfied the Rule 24(a)(2) requirements and that the district court had abused its discretion in denying the motion. Because, as a corollary, "intervention would destroy complete diversity," id. at 547, we then turned to the indispensability analysis mandated by Rule 19(b). The analysis did not get far; observing that the district court had not independently analyzed the Rule 19(b) question, we remanded for further findings and an opportunity for the district court to select the way in which to resolve the problem (i.e., dismiss the entire case, retain jurisdiction but limit the relief available to the nondiverse company, et cetera, see id. at 547-48). In doing so, however, we suggested strongly that, insofar as appellees sought an injunction that would affect the assignee's interests under the contract, Kellogg Caribbean was an indispensable party.

In the case under review, the original and amended complaints alleged only state-law claims, observed that DCC was a Delaware corporation and Rivera a Puerto Rican resident, and thus

-14-

properly invoked the district court's diversity jurisdiction. However, intervenors Coachman and Olympic Mills, were, like DCC, Delaware corporations, and entered as (nondiverse) party defendants.[8]  Because the parties, on appeal at least, do not assign error to the intervention of Coachman and Olympic Mills per se, we proceed directly to the Rule 19(b) analysis to determine whether that intervention divested the district court of subject-matter jurisdiction.  See Kellogg, 440 F.3d at 547; cf. Metro. Life Ins. Co. v. Ditmore, 729 F.2d 1, 9 (1st Cir. 1984) (holding that a necessary party under Rule 19(a) would be entitled a priori to intervene as of right under Rule 24(a)).

        **2.**    **Indispensability**.  This task requires us to decide whether Coachman and Olympic Mills are indispensable; if they are, the entire case must be dismissed for want of subject-matter

---

[8] Coachman and Olympic Mills appear to have entered the contract dispute (later adversary proceeding No. 03-0090) as defendant intervenors, although their alignment is not entirely clear from the record.  We have the authority to determine this matter for ourselves, see City of Indianapolis v. Chase Nat'l Bank, 314 U.S. 63, 69 (1941) (courts have a "duty" to "look beyond the pleadings and arrange the parties according to their sides in the dispute"); Gabriel v. Preble, 396 F.3d 10, 14 (1st Cir. 2005), but the inquiry is academic: Coachman and Olympic Mills are nondiverse no matter whom they are aligned against in this case.  The adversary complaint filed on behalf of Coachman and Olympic Mills in adversary proceeding No. 03-0042 identifies Coachman and Olympic Mills as Delaware corporations with their principal place of business in Puerto Rico.  Consequently, even if an analysis of the parties' actual interests more accurately pitted Coachman and Olympic Mills against Rivera, and we were to realign the parties accordingly, citizens of Puerto Rico would then stare at each other from across the "v."  See § 1332(c)(1).

jurisdiction. See Provident Tradesmens Bank & Trust v. Patterson, 390 U.S. 102, 116-19 (1968). As we stated in Kellogg, "Rule 19(b) provides that, if a nonparty is deemed necessary to litigation but joining that nonparty would deprive the court of jurisdiction, the court should permit the action to proceed only to the extent that 'equity and good conscience' warrant." Kellogg, 440 F.3d at 547 (quoting Provident Tradesmens Bank & Trust, 390 U.S. at 109). Four factors guide the inquiry:

> [F]irst to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

Fed. R. Civ. P. 19(b). From these factors, the Supreme Court has identified four corresponding interests: (1) the interest of the outsider whom it would have been desirable to join; (2) the defendant's interest in avoiding multiple litigation, inconsistent relief, or sole responsibility for a liability it shares with another; (3) the interest of the courts and the public in complete, consistent, and efficient settlement of controversies; and (4) the plaintiff's interest in having a forum. H.D. Corp. of P.R. v. Ford Motor Co., 791 F.2d 987, 992 (1st Cir. 1986) (citing Provident Tradesmens Bank & Trust, 390 U.S. at 108-11).

-16-

We pause momentarily to address a wrinkle. The above factors and interests require fact-intensive analysis, "involve the balancing of competing interest[,] and must be steeped in 'pragmatic considerations.'" Travelers Indem. Co. v. Dingwell, 884 F.2d 629, 635 (1st Cir. 1989) (quoting Advisory Committee Notes). For these reasons, the findings and conclusions of a district court are entitled to deference on appeal, id., and the absence of independent analysis (or any analysis at all) is a reason for remand. See Kellogg, 440 F.3d at 548. In the present case, the district court's text order granting intervention did not address the dispensability or indispensability of Coachman and Olympic Mills, and there is nothing in the record in the five months separating intervention from referral that sufficiently indicates what consideration, if any, the district court gave the matter. Yet in this situation remanding this case to the district court, which, as we have said, is in the "preferred position" to make Rule 19(b) determinations, Travelers Indem. Co., 884 F.2d at 635, would be nothing short of Kafkaesque. As the above recitation makes clear, the travel of this case to date borders on the bizarre, and we see little wisdom in further complicating it. Here, the BAP did address the question and concluded that Coachman and Olympic Mills were not indispensable. Given the procedural tangle described above, and the impracticality (bordering on absurdity) of remand, we will proceed to decide the matter without remand under the

plenary standard normally used in reviewing the legal conclusions of the BAP. See Carvalho v. Fed. Nat'l Mortgage Assoc. (In re Carvalho), 335 F.3d 45, 49 (1st Cir. 2003); Takeda v. Nw. Nat'l Life. Ins. Co., 765 F.2d 815, 818 n.2 (9th Cir. 1985) ("Although in some cases it might be desirable to remand to allow a district court to determine whether a nondiverse party is indispensable, we have the power to decide the joinder issue on appeal.").

A review of the factors and interests outlined above leads us inexorably to the conclusion that Coachman and Olympic Mills are not indispensable.

Rivera's argument that Coachman and Olympic Mills are indispensable because they have competing claims over the same res ignores the posture of this case. First, the causes of action involved in the district court (later adversary proceeding No. 04-0090) and the bankruptcy court (adversary proceeding No. 03-0042) were completely different. In district court, DCC pursued Rivera in his personal capacity for violating ¶ 4 of the Subordination Agreement, which required Rivera (1) to hold in trust any cash or collateral received from Coachman in payment of the principal of the subordinated debt, and (2) immediately to pay over to DCV the cash or collateral held in trust for application to the senior debt until the senior debt was repaid in full. Coachman and Olympic Mills had no such claim against Rivera (before or after they filed for bankruptcy), and instead sued him in bankruptcy court in

-18-

adversary proceeding No. 03-0042, alleging fraudulent conveyances and other related causes of action. See Torcise v. Cmty. Bank of Homestead (In re Torcise), 116 F.3d 860, 865-66 (11th Cir. 1997) (secured creditor that initiated separate state-law action against bank was not indispensable party to adversary proceeding brought by Chapter 11 debtors' unsecured creditors committee against bank to recover fraudulent and preferential payments).  Second, and relatedly, Coachman and Olympic Mills were independently capable of making a run at Rivera's money using different means from the point in time when they filed for Chapter 11 protection, November 26, 2001.  Cf. Baker v. Minn. Min. and Mfg. Co., Inc., 99 Fed. Appx. 718, 723-24 (6th Cir. 2004) (partial subrogee not an indispensable party because it can recover whatever it is owed in a separate action); Dainippon Screen Mfg. Co. v. CFMT, Inc., 142 F.3d 1266, 1272 (Fed. Cir. 1998) (licencee of patent is not indispensable because it could cause the patent owner to bring a separate action for infringement).

Rivera also relies unduly on Coachman's obligations under the Subordination Agreement to support his indispensability pitch. Under the terms of the Subordination Agreement, the subordination and trust obligations ran from Rivera (the obligor) to DVC (the obligee).  Coachman was a signatory to the Subordination Agreement, but its participation was perfunctory: Coachman simply promised that Rivera's obligations under the Subordination Agreement would

not impair its obligations under the Note, under which it was the sole obligor. Even if we were to conclude that Coachman was a co-obligor under the Subordination Agreement — as opposed to a mere promissor — it is clear that co-obligors generally are not indispensable parties in contract disputes that do not involve reformation, cancellation, rescission, or otherwise challenge the validity of the contract. See, e.g., Universal Reinsurance Co. v. St. Paul Fire & Marine Ins. Co., 312 F.3d 82, 87 (2d Cir. 2002) (joint obligors not indispensable); Janney Montgomery Scott, Inc. v. Shepard Niles, Inc., 11 F.3d 399, 405 (3d Cir. 1993) (co-obligor/non-obligee not indispensable); Brackin Tie, Lumber & Chip Co., Inc. v. McLarty Farms, Inc., 704 F.2d 585, 586-87 (11th Cir. 1983) (co-obligors/non-obligees are not indispensable); Bio-Analytical Servs., Inc. v. Edgewater Hosp., Inc., 565 F.2d 450, 452-53 (7th Cir. 1977) (guarantor/co-obligor not indispensable); Trans. Pacific Corp. v. S. Seas Enters., Ltd., 291 F.2d 435, 436 (9th Cir. 1961) (per curiam) (joint obligors not indispensable when the suit is not for rescission, but for damages for breach of contract); 7 Charles Alan Wright et al., Federal Practice & Procedure § 1613, at 177-78 (3d ed. 2001) ("Joint obligors thus typically are treated as Rule 19(a) parties, but are not deemed indispensable under Rule 19(b)."); c.f. H.D. Corp. of P.R., 791 F.2d at 993 (nondiverse parent corporation was indispensable because it was a signatory to the agreements at issue in the

litigation and plaintiffs' claims were largely directed against it, not the diverse defendant subsidiary corporation); Acton Co., Inc. of Mass., 668 F.2d at 77-78 (nondiverse parent corporation was indispensable because it was a party to the agreements at issue in the litigation, played a substantial role in the negotiation of those agreements, and stood to lose a sizable deposit).

Finally, Rivera's assertion that DCC sought injunctive relief against Coachman and Olympic Mills misrepresents the record. If true, such a request might weigh heavily in favor of indispensability. See, e.g., Kellogg, 440 F.3d at 548 (stating that nondiverse intervenor was indispensable insofar as plaintiff sought an injunction that affected the intervenor's interests under the agreements); Acton Co., Inc. of Mass., 668 F.2d at 81-82 (seeking recision of a contract makes all parties to that contract, and others having a substantial interest in it, indispensable parties); 7 Charles Alan Wright et al., Federal Practice & Procedure § 1613, at 196 (3rd ed. 2001) ("[I]n an action seeking specific performance of a contract all persons who will be required to act to carry out a court order compelling performance have been held to be indispensable parties."). But review of the amended complaint shows that DCC sought only to prevent Rivera, in his capacity as chairman and chief executive officer, from directing Coachman and Olympic Mills to repay his subordinated loans until DCV's senior loan was paid in full. DCC sought nothing from

-21-

Coachman or Olympic Mills directly or in any way that would affect their interest under the Subordination Agreement.

Under these circumstances, where pragmatism strongly militates against a finding of indispensability and Rivera has not persuaded us otherwise, the plaint falls far short of the mark.

3. **Divestiture**. Whether dispensable, nondiverse defendant-intervenors destroy complete diversity is a question we have not addressed squarely. An insensitive reading of Kellogg — but one that would not necessarily be inconsistent with our strict construction of the complete-diversity rule — would seem to suggest that nondiverse intervenors are incompatible with the tenets of the rule. But "[j]udges expect their pronunciamentos to be read in context," Wisehart v. Davis, 408 F.3d 321, 326 (7th Cir. 2005), and the broader context of Kellogg does not support such an absolutist approach. Kellogg involved a likely indispensable party that, as assignee under the contract at issue, sought (effectively) to substitute itself for the diverse defendant by means of intervention as of right. Intervention was thus the product of the plaintiff-appellees' choice to sue the diverse assignor instead of the nondiverse assignee. This was untenable in Kellogg because a plaintiff cannot circumvent complete diversity by artful pleading; otherwise, "a plaintiff could leave non-diverse defendants out of the original lawsuit and then wait for them to be impleaded or otherwise joined." Acton Co., Inc. of Mass., 668 F.2d at 79; see

also <u>Owen Equip. & Erection Co.</u> v. <u>Kroger</u>, 437 U.S. 365, 374-75, 377 (1978).

The circumstances surrounding the intervention of Coachman and Olympic Mills in the present case are strikingly different from those in <u>Kellogg</u>. DCC did not need the participation of Coachman or Olympic Mills to collect the money Rivera had retained in breach of the Subordination Agreement. When Coachman and Olympic Mills eventually sought intervention as of right, the interests they advanced flowed directly from their status as debtors-in-possession. Critically, these interests did not arise until Coachman and Olympic Mills filed for bankruptcy on November 26, 2001, almost a month <u>after</u> DCC filed suit against Rivera. <u>See</u> <u>Freeport-McMoRan, Inc.</u>, 498 U.S. at 428 (a nondiverse dispensable party that had no interest in the outcome of the litigation until sometime after suit was commenced did not defeat diversity jurisdiction); <u>Aurora Loan Servs., Inc.</u> v. <u>Craddieth</u>, 442 F.3d 1018, 1025 (7th Cir. 2006) (holding that diversity jurisdiction was not destroyed by the intervention of a nondiverse party whose claims arose in the course of a foreclosure proceeding after it obtained the certificate of sale); <u>Salt Lake Tribune Publ'g Co., LLC</u> v. <u>AT & T Corp.</u>, 320 F.3d 1081, 1095-97 (10th Cir. 2003) (similar, but in the context of a disputed option to purchase the assets of a newspaper operation). There was thus no two-step

evasion of the diversity requirement here such as was lurking behind the pleadings in Kellogg.

In similar situations, the weight of authority holds that claims launched by necessary but dispensable, nondiverse defendant-intervenors do not defeat the original jurisdiction (diversity) that obtained at the commencement of the action.[9]  See, e.g., Mattel, Inc. v. Bryant, 446 F.3d 1011, 1013 (9th Cir. 2006) (per curiam); Aurora, 442 F.3d at 1025-26; Grimes v. Mazda N. Am. Operations, 355 F.3d 566, 573 (6th Cir. 2004); Viacom Int'l, Inc., 212 F.3d at 726-28; United Capitol Ins. Co. v. Kapiloff, 155 F.3d 488, 492 (4th Cir. 1998); Dev. Fin. Corp. v. Alpha Hous. & Health Care, Inc., 54 F.3d 156, 160 (3d Cir. 1995); see also Freeport-McMoRan, 498 U.S. at 428 (citing Wichita R.R. & Light Co. v. Pub. Util. Comm'n of Kan., 260 U.S. 48, 54 (1922) ("Jurisdiction once

_____

[9] From this perspective, the proper alignment of Coachman and Olympic Mills becomes more than an academic exercise, see supra note 8, because the intervention of a nondiverse party as a plaintiff raises a suspicious judicial eyebrow under § 1332.  See, e.g., Aurora, 442 F.3d at 1025-26; Viacom Int'l, Inc. v. Kearney, 212 F.3d 721, 726-28 (2d Cir. 2000); accord Acton Co., Inc. of Mass., 668 F.2d at 79.  Although this is a close call (perhaps because it is difficult to quantify and compare the parties' competing and complex interests), the record does not support realigning Coachman and Olympic Mills as plaintiff intervenors.  Coachman and Olympic Mills intervened to forestall DCC from collecting on a favorable judgment it had received just ten days earlier, and then sued DCC (plus Rivera and others) when the district court did not immediately refer the case to the bankruptcy court.  Certainly the intervenors had interests adverse to Rivera's, but, on balance and in light of the circumstances surrounding the intervention, DCC was the more antipodean player as competitor for Rivera's ill-gotten gains.

acquired . . . is not divested by a subsequent change in the citizenship of the parties. Much less is such jurisdiction defeated by the intervention, by leave of the court, of a party whose presence is not essential to a decision of the controversy between the original parties.")). The present case offends the complete-diversity rule even less: in adversary proceeding No. 03-0090 (the case at bar), Coachman and Olympic Mills made no claims against any party and no party made any claims against them. (This is not the case, of course, in adversary proceeding No. 03-0042, which is not before us.)[10]

Confident in our jurisdiction, we proceed directly to the merits.

### B.    The Contract Claims

**1.    Subordination**.    The parties dispute the capture of the term "Subordinated Debt" as defined in ¶ 1.a the Subordination Agreement.    DCC contends, and the lower courts unanimously agreed,

---

[10] In its supplemental brief, DCC suggests that, were we to hold that intervention had defeated the district court's jurisdiction (which we do not), we should exercise our power under Fed. R. Civ. P. 21 and, to preserve diversity, dismiss the case as to Coachman and Olympic Mills. See Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826, 837 (1989). DCC's suggestion is puzzling. Although neither party brought this fact to the Court's attention, our independent review of the record reveals that Coachman and Olympic Mills were to be dismissed from adversary proceeding No. 03-0090 in accordance with a settlement stipulation in adversary proceeding No. 03-0042. This dismissal alone would have cured any jurisdictional defect ailing the case up to that point and invocation of Rule 21 would be superfluous as a result. Cf. Caterpillar, Inc. v. Lewis, 519 U.S. 61, 65, 68-69 (1996).

that the plain language in the Subordination Agreement subordinates all of Rivera's loans to Coachman and its affiliates, irrespective of the time they were made. Rivera disputes this conclusion and argues that the plain language subordinates only loans made before the execution of the Subordination Agreement or, in the alternative, that the language is ambiguous and should thus be construed against its drafter, DCC. This distinction is critical because Rivera submits that the contested payments apply only to his loans that post-date the Subordination Agreement, not his previous loans that, under the Subordination Agreement, constitute subordinated debt.

The parties identify two provisions in the Subordination Agreement as evidence tending to support their respective positions. The first is defining "Subordinated Debt," provided below in full:

> "**Subordinated Debt**" shall mean all principal, interest, fees, costs, enforcement expenses (including legal fees and disbursements), collateral protection expenses and other reimbursement and indemnity obligations that the Subordinating Creditor [Rivera] has loaned to the Borrower [Coachman] or any of its affiliates.

The second details "Subordination," and reads in pertinent part:

> **7. Subordination.** The Senior Debt [DCV's $2 million bridge loan] and the Note and any and all other documents and instruments evidencing or creating the Senior Debt and all guaranties, mortgages, security agreements, pledges and other collateral guarantying or securing the Senior Debt or any part thereof

shall be senior to the Subordinated Debt irrespective of the time of the execution, delivery or issuance of any thereof.

Both DCC and Rivera agree (ignoring Rivera's alternate argument for the moment) that these provisions are unambiguous, but in opposite ways. Displaying its conjugative prowess, DCC argues that "shall mean" indicates "the future progressive tense and, as the main verb phrase in this definitional section, use of the those words require that the entire definition is to be read at the time the [Subordination Agreement] is being enforced, not the time at which it was executed." Not to be syntactically outplayed, Rivera responds that "has loaned" can only refer to loans outstanding as of the date of the Subordination Agreement, and cannot possibly encompass loans made after that date. The grammatical acrobatics continue with competing interpretations of the "Subordination" clause, specifically with respect to the following language: "irrespective of the time of the execution, delivery or issuance of any thereof." DCC posits that this language modifies "Subordinated Debt," which is the closest noun; Rivera argues that it modifies "Senior Debt," which is the direct object of "shall be senior."

DCC also invokes two provisions in the Note to support its interpretation of the Subordination Agreement. The first is the Note's definition of the Subordination Agreement, which is attached to the Note as an annex, provided in ¶ 1.(xiv):

> **"Subordination and Standby Agreement"**
> shall mean the agreement (Annex D) by Mr. Luis

-27-

Rivera to subordinate and defer repayment of the principal of any loan by him to the Company [Coachman], Olympic Mills Corp., Olympic Group, Inc. or the new entity pursuant to the Hampshire Agreement until this Note is converted and repaid.

The second, a condition precedent to DCV's loan under the Note, is provided in ¶ 5.1:

*Subordination and Standby Agreement.* Mr Luis Rivera Siaca shall execute an irrevokable Subordination and Standby Agreement, in the form attached here to as <u>Annex D</u>, whereby his loans to the Company [Coachman] or its affiliates are subordinated to this Note and he agrees to defer payment of principal on such loans until this Note is either converted into Series E preferred Stock or is repaid.

Using this language, and corresponding language in the Subordination Agreement that it claims expressly incorporates the Note by reference (<u>i.e.</u>, the recital that identifies the execution of the Subordination Agreement as a "condition precedent to the Lender's [DCV] willingness to make a loan to the Borrower [Coachman] pursuant to the Note"), DCC argues that the "Subordinated Debt" unambiguously applies to all of Rivera's loans to Coachman and its affiliates. Rivera concedes that the Subordination Agreement "refers to and describes the Note," but denies that it incorporates the Note by reference. Also, Rivera argues that the Note is "outside the four corners" of the Subordination Agreement, and, for the purposes of deciding their contract dispute, constitutes extrinsic evidence.

-28-

We review de novo the decisions of the district court (liability) and the bankruptcy court (damages) granting summary judgment, and owe no particular deference to the conclusions of the BAP. See Razzaboni v. Schifano (In re Schifano), 378 F.3d 60, 66 (1st Cir. 2004). We also review de novo questions of contractual interpretation, unless disputed and genuine issues of material fact (over extrinsic evidence, for example) bear upon the interpretation of ambiguous language. See Liberty Mut. Ins. Co. v. Greenwich Ins. Co., 417 F.3d 193, 197 (1st Cir. 2005).

It is undisputed that, pursuant to ¶ 12 of the Subordination Agreement (and ¶ 16 of the Note), Delaware provides the governing substantive law. Under Delaware law, "[t]he basic rule of contract construction gives priority to the intention of the parties." E.I. du Pont de Nemours & Co. v. Shell Oil Co., 498 A.2d 1108, 1113 (Del. 1985). "In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein." Id. "Moreover, the meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan." Id. "Where the contract language is clear and unambiguous, the parties' intent is ascertained by giving the language its ordinary and usual meaning." Nw. Nat'l Ins. Co. v. Esmark, Inc., 672 A.2d 41, 43 (Del. 1996). "Courts consider extrinsic evidence to interpret the

agreement only if there is an ambiguity in the contract." <u>Id.</u> "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction. Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations." <u>Rhone-Poulenc Basic Chems. Co.</u> v. <u>Am. Motorists Ins. Co.</u>, 616 A.2d 1192, 1196 (Del. 1992).

To our knowledge, the Delaware Supreme Court has not yet had occasion to apply, as we have, the long-recognized principle that,

> in the absence of anything to indicate a contrary intention, instruments executed at the same time, by the same contracting parties, for the same purpose, and in the course of the same transaction will be considered and construed together as one contract or instrument, even though they do not in terms refer to each other.[11]

11 Richard A. Lord, <u>Williston on Contracts</u> § 30:26 at 239-42 (4th ed. 1999) (citing <u>Bailey</u> v. <u>Hannibal & St. Joseph R.R. Co.</u>, 84

---

[11] This principle is associated with but distinct from a court's consideration of a separate writing expressly incorporated by reference — something the Delaware Supreme Court has recognized (but with material limitations) and what DCC argues should permit this court to read the Subordination Agreement along side the Note. <u>Compare</u> 11 <u>Williston on Contracts</u> § 30:25 ("Writing Expressly Incorporated By Reference"), <u>with id.</u> § 30:26 ("Writing Implicitly Incorporated By Reference"); <u>see</u> <u>Delaware</u> v. <u>Black</u>, 83 A.2d 678, 681 (Del. 1951) (holding that a contract may incorporate by reference provisions in another instrument but only to the extent that the incorporated matter is specifically set forth or identified); <u>see</u> <u>also</u> <u>Realty Growth Investors</u> v. <u>Council of Unit Owners</u>, 453 A.2d 450, 454 (Del. 1982) (similar); <u>Pauley Petroleum, Inc.</u> v. <u>Cont'l Oil Co.</u>, 231 A.2d 450, 456 (Del. Ch. 1967) (same).

U.S. 96 (1872)); see Crowe v. Bolduc, 365 F.3d 86, 95-97 (1st Cir. 2004) (using other documents in same transaction to find that contract was not ambiguous under Maine law); Crowe v. Bolduc, 334 F.3d 124, 137 (1st Cir. 2003) (using principle to find contract ambiguous under Maine law); cf. Senior v. NSTAR Elec. & Gas Corp., 449 F.3d 206, 219 (1st Cir. 2006) (using principle to construe an ambiguous collective bargaining agreement). We think it fair to predict that, were the Delaware Supreme Court presented with this question, it would read the disputed language of the Subordination Agreement in light of the pertinent provisions of the Note.[12] Both contracts were signed on the same day (February 24, 2000) between substantially the same parties (Rivera signed the Note as Coachman's chairman) as facets of the same transaction (the

---

[12] We observe that Delaware's Chancery courts, in the figurative trenches of contract interpretation, have recognized and applied this precept in making ambiguity determinations. Gildor v. Optical Solutions, Inc., No. 1416-N, 2006 WL 1596678 at *6 n.16 (Del. Ch. June 5, 2006) (Strine, V.C.) (unpublished); Simon v. The Navellier Series Fund., No. 17734, 2000 WL 1597890 at *7 & n.33 (Del. Ch. Oct. 19, 2000) (Strine, V.C.) (unpublished); Crown Books Corp. v. Bookstop, Inc., No. 11255, 1990 WL 26166 at *6 (Del. Ch. Feb. 28, 1990) (Allen, C.J.) (unpublished). The lower federal courts in Delaware have recognized this principle as well. See Magten Asset Mgmt. Corp. & Law Debenture Trust Co. of N.Y. v. Nw. Corp. (In re Nw. Corp.), 313 B.R. 595, 601 (Bankr. D. Del. 2004) ("Under Delaware law, all related documents and instruments in a single transaction together are harmonized to the extent possible."); Huyler's v. Ritz-Carlton Rest. & Hotel Co. of Atlantic City, 1 F.2d 491, 492 (D. Del. 1924) ("It is true that the principle by which instruments executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction are considered as one, and receive the same construction as if embodied in one instrument, is of wide application and the illustrative cases are many.").

infusion of capital into the Coachman enterprise) for a unitary purpose (to fund the acquisition of sweaters). As further evidence of symbiosis, the execution of the Subordination Agreement was listed as a condition precedent to the Note, and the document was physically attached to the Note as an annex. Also, neither document contains a merger clause or any indication of the parties' intent to read each contract in isolation.

The language of the Subordination Agreement quickly comes into focus when viewed through the lens of the Note. The most obvious blow to Rivera's interpretation of the Subordination Agreement is the Note's use of "any loan" in ¶ 1.(xiv), without any accompanying prospective limitation. In fact, subsequent language in ¶ 1.(xiv) shows that such a limitation could not have been intended. In pertinent part, ¶ 1.(xiv) explains that the Subordination Agreement would require Rivera "to subordinate and defer repayment of the principal of <u>any loan</u> by him to the Company [Coachman], Olympic Mills Corp., Olympic Group, Inc. <u>or the new entity</u> pursuant to the Hampshire Agreement until this Note is converted and repaid." (Emphasis supplied.) However, prior to February 24, 2000, Rivera had extended loans to Coachman and Olympic Mills only; he did not extend any loans to the "new entity" (a/k/a/ Glamourette) until afterwards. (It is unclear even whether Glamourette existed on the date of the signing.) Further, ¶ 5.1 provides that DCV's loan would issue only if Rivera would agree

that "his loans to the Company [Coachman] <u>or its affiliates</u> [not simply "and its affiliate Olympic Mills"] are subordinated to this Note."  (Emphasis supplied.)  The Subordination Agreement uses similarly broad language in ¶ 1.(xiv): "the Subordinating Creditor [Rivera] has loaned to the Borrower [Coachman] <u>or any of its affiliates</u>."  (Emphasis supplied.)

We are unwilling to endorse, as Rivera would have us do, an interpretation of "has loaned" that would render the above language meaningless or superfluous, see <u>Crowe</u>, 365 F.3d at 97, and that would run counter to the overall scheme that these documents were designed to effect.[13]  See <u>E.I. du Pont de Nemours</u>, 498 A.2d at 1113.  Because the disputed language is not <u>reasonably</u> susceptible of different interpretations, see <u>Rhone-Poulenc</u>, 616 A.2d at 1195, we hold that the Subordination Agreement, when properly read in conjunction with the Note, unambiguously covers the post-Subordination Agreement loans at issue in this case.[14]  We

_____

[13] Rivera's argument that the phrase "pursuant to the Hampshire Agreement" in ¶ 1.(xiv) of the Note limits subordination to "specific indebtedness" lacks merit.  As an initial matter, it is debatable whether this language imports a subject-matter restraint on the Subordination Agreement or simply associates the "new entity" with the Hampshire venture.  But even giving Rivera the benefit of the doubt, he admits that the loans that post-date the Subordination Agreement were to provide additional capital for the acquisition of Hampshire assets, presumably after the depletion of DCV's loan.

[14] We reach this conclusion in spite of DCC's assertion that "shall mean," as it is used to define "Subordinated Debt" in ¶ 1.b of the Subordination Agreement, independently denotes the very specific intention that DCC assigns to it (without any further

-33-

are therefore not required (or permitted), under Delaware law, to consider evidence extrinsic to these documents. See Eagle Indus., Inc. v. DeVilbiss Health Care, Inc., 702 A.2d 1228, 1232 (Del. 1997).[15]

**2. Equitable Estoppel.** In a last-ditch attempt to avert liability, Rivera contends that the doctrine of equitable estoppel precludes DCC from enforcing the Subordination Agreement. Specifically, Rivera argues that president of DCC and then Coachman director Wayne Foren "expressly consented to or knowingly acquiesced in" the repayment of Rivera's loans.[16] To support his argument, Rivera touts (1) an April 14, 2000 letter in which Foren proposed that Rivera provide a $3 million short-term credit line that would be exempt from the Subordination Agreement, and (2) the

---

indication here that "shall mean" bears on the question presented). Such language is common in defining contractual terms, as exemplified by the very contracts in this case: both defined terms in the Subordination Agreement ("Senior Debt" is the other, in ¶ 1.a), and all fourteen in the Note, employ "shall mean" to convey the terms' intended meaning.

[15] We need not, and therefore do not, address the parties' competing interpretations of the "Subordination" clause in ¶ 7 of the Subordination Agreement. Assuming without deciding that "irrespective of the time of the execution, delivery or issuance of any thereof" modifies the term "Senior Debt," this interpretation is not at all inconsistent with our holding with respect to the definition of "Subordinated Debt" in ¶ 1.b and the related provisions in the Note.

[16] Foren was elected to Coachman's board of directors as a condition precedent to the bridge loan, pursuant to ¶ 5.3 of the Note. Although his term in office was to continue "as long as any amount is outstanding" under the Note, Foren resigned in February 2001 when Coachman defaulted.

December 12, 2000 board minutes that do not indicate whether Foren objected to the prospect that Coachman would use proceeds from the Puerto Rico Industrial Incentive Fund to repay Rivera's $4 million loan that pre-dated the Subordination Agreement. Ignoring the fact that Rivera did not present the April 14 letter to the district court in his opposition to DCC's summary judgment motion, the dispositive flaw in this evidence is that it fails to show how Rivera was induced to rely — let alone detrimentally — on Foren's conduct. See VonFeldt v. Stifel Financial Corp., 714 A.2d 79, 87 (Del. 1998) (requiring a showing of detrimental reliance to support a claim of equitable estoppel). Without more, we are bound to reject this argument.

3. **Damages**. Rivera's contention that the bankruptcy court's award does not accurately reflect expectation damages, see Duncan v. Theratx, Inc., 775 A.2d 1019, 1022 (Del. 2001) (requiring the breaching promisor to compensate the promisee for the promisee's reasonable expectation of the value of the breached contract), is waived on at least two grounds. First, as presented to the district court (and later reiterated to the bankruptcy court), the argument was fatally undeveloped, comprising only four sentences, a citation to a district court opinion, and no analysis whatsoever. See McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 22 (1st Cir. 1991) ("theories not raised squarely in the district court cannot be surfaced for the first time on appeal"). Second,

-35-

as presented to us, the argument impermissibly depends on an entirely new factual predicate: that "Olympic and Glamourette had many other creditors besides Rivera Siaca to whom money was owned and who could have been paid without violating the Subordination Agreement." See Cochran v. Quest Software, Inc., 328 F.3d 1, 11 (1st Cir. 2003) ("a party may not advance for the first time on appeal either a new argument or an old argument that depends on a new factual predicate"). For these reasons, we decline to entertain it.

## III. CONCLUSION

To sum up, we hold first that the intervention of nondiverse Coachman and Olympic Mills has not destroyed diversity jurisdiction, and that we have jurisdiction to decide the merits of this appeal as a result; second, that the Subordination Agreement, when properly read in tandem with the Note, unambiguously governs the loans disputed in this case; and third, that Rivera's remaining arguments are either without merit (equitable estoppel) or waived (damages). The judgment of the BAP is therefore

        Affirmed.