George J. CHAREST and Paula
M. Charest, Plaintiffs,

v.

FEDERAL NATIONAL MORTGAGE
ASSOCIATION, Defendant.

Civil Action No. 13–11267–MBB.

United States District Court,
D. Massachusetts.

Signed March 27, 2014.

Josef C. Culik, Culik Law PC, Woburn, MA, Peter J. Towne, Swartz & Swartz, Boston, MA, for Plaintiff.

Justin M. Fabella, Maura K. McKelvey, Jennifer S. Madjarev, Hinshaw & Culbertson LLP, Boston, MA, for Defendant.

## MEMORANDUM AND ORDER RE: DEFENDANT FEDERAL NATIONAL MORTGAGE ASSOCIATION'S MOTION TO DISMISS THE COMPLAINT (DOCKET ENTRY # 18)

BOWLER, United States Magistrate Judge.

Pending before this court is a motion to dismiss filed by defendant Federal National Mortgage Association ("Fannie Mae"). (Docket Entry # 18). After conducting a hearing, this court took the motion under advisement. The complaint raises a single cause of action under section nine of Massachusetts General Laws chapter 93A ("chapter 93A").

### STANDARD OF REVIEW

In conducting a Fed.R.Civ.P. 12(b)(6) ("Rule 12(b)(6)") analysis, a court "accept[s] as true all well pleaded facts in the complaint and draw[s] all reasonable inferences in favor of the plaintiffs." *Gargano v. Liberty International Underwriters, Inc.*, 572 F.3d 45, 48 (1st Cir. 2009). To survive dismissal, "the complaint must allege 'a plausible entitlement to relief.'" *Fitzgerald v. Harris*, 549 F.3d 46, 52 (1st Cir.2008). While "detailed factual allegations" are not required, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement for relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007);

*Maldonado v. Fontanes*, 568 F.3d 263, 266 (1st Cir.2009). In addition, "a well-pleaded complaint may succeed even if . . . actual proof of those facts is improbable." *Bell Atlantic v. Twombly*, 550 U.S. at 556, 127 S.Ct. 1955.

■ In evaluating a Rule 12(b)(6) motion, the court may consider a limited category of documents outside the complaint without converting the motion into one for summary judgment. Such documents include public records and documents sufficiently referred to in the complaint. *See Butler v. Balolia*, 736 F.3d 609, 611 (1st Cir.2013) (supplementing facts in complaint "by examining 'documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice'"); *Freeman v. Town of Hudson*, 714 F.3d 29, 36 (1st Cir.2013) (court may consider "'official public records; documents central to plaintiffs' claim; and documents sufficiently referred to in the complaint'") (ellipses and internal brackets omitted); *Giragosian v. Ryan*, 547 F.3d 59, 65–66 (1st Cir.2008) (can consider documents relied on in complaint, public records and other documents subject to judicial notice). The complaint refers to the Fannie Mae Single Family Servicing Guide, a document central to the chapter 93A claim, and identifies its internet address.[1] It is therefore part of the Rule 12(b)(6) record.

■ "Exhibits attached to the complaint are" also "properly considered part of the pleading 'for all purposes,' including Rule 12(b)(6)." *Trans–Spec Truck Service, Inc. v. Caterpillar Inc.*, 524 F.3d 315, 321 (1st Cir.2008). In the event "'a writ-

---

1. To the extent this court relies on a version of the guide in effect during different years or time periods, this court may take judicial notice of the guide. *See, e.g., Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 556 (7th Cir.2012) (considering Home Affordable Mortgage Program supplemental directives under Rule 12(b)(6) because "public documents and reports of administrative bodies that are proper subjects for judicial notice").

ten instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations.'" *Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 32 (1st Cir. 2000) (quoting *Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 454 (7th Cir.1998), in parenthetical). Facts in the Rule 12(b)(6) record are as follows.

## FACTUAL BACKGROUND

Plaintiffs George J. Charest and Paula M. Charest ("the Charests") own property located in Groveland, Massachusetts ("the property"). In 2008, they refinanced a mortgage on the property in the amount of $230,000 ("the mortgage"). (Docket Entry # 1–1, ¶ 19). At the time, the Charests' credit scores were approximately 706 and the property's value was $445,000. (Docket Entry # 1–1, ¶ 19).

"Fannie Mae is the investor [which] owns the Charests' mortgage." (Docket Entry # 1–1, ¶ 3). Throughout the relevant time period, GMAC Mortgage, LLC ("GMAC") serviced the mortgage under a form mortgage selling and servicing contract ("servicing contract") with Fannie Mae.[2] (Docket Entry # 1–1, ¶ 14). The servicing contract dictated that, "Any mortgage serviced under this Contract, which we own . . ., *must* be serviced by the Lender," i.e., GMAC, "according to the provisions in our Guides" currently in effect "or as amended in the future." (Docket Entry # 14) (emphasis added). The servicing contract therefore required GMAC to abide by the supplemental directives and guidelines applicable to the Home Affordable Modification Program ("HAMP").[3]

The servicing contract required GMAC to manage the property "according to the terms of the mortgage and [Fannie Mae's] Guides." (Docket Entry # 14). In return for servicing and managing the property in accordance with the Guides, GMAC received compensation.[4] (Docket Entry # 14). Under the servicing contract, all mortgage records belonged to Fannie Mae. The servicing contract also required GMAC to indemnify Fannie Mae if any private entity made a claim or filed suit against Fannie Mae based on GMAC's conduct in servicing the mortgage or managing or disposing of the property. Fannie Mae "reserv[ed] the right to restrict [GMAC's] sale or servicing" of the mort-

2. The complaint attaches a copy of the servicing contract. Fannie Mae and GMAC executed the contract prior to the Charests' 2008 refinancing.

3. In 2008 Congress enacted the Emergency Economic Stabilization Act of 2008, 12 U.S.C. §§ 5201–61, to "restore liquidity and stability to the financial system" and ensure inter alia the protection of home values and the preservation of home ownership. 12 U.S.C. § 5201. The statute expressly delegated authority to the Secretary of the Treasury to issue "such regulations and other guidance as may be necessary or appropriate to define terms or carry out the authorities or purposes of this chapter." 12 U.S.C. § 5211(c). It also explicitly directed the Secretary to issue "[p]rogram guidelines." 12 U.S.C. § 5211(d). Specific to RAMP, section 5219(a)(1) "author-

ized the Secretary of the Treasury to, inter alia, 'implement a plan that seeks to maximize assistance for homeowners and encourage the servicers of the underlying mortgages' to minimize foreclosures." *Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 228 (1st Cir. 2013) (quoting 12 U.S.C. § 5219(a)(1)) (internal ellipses omitted). Created in February 2009, RAMP is one of those programs. *Id.*

4. Servicers subject to RAMP under a servicing contract with Fannie Mae receive financial incentives to encourage them to enter into permanent loan modifications with homeowners. *Young v. Wells Fargo Bank, N.A.*, 717 F.3d at 229 ("[l]oan servicers receive a $1,000 payment for each permanent modification, in addition to other incentives").

gage under the servicing contract.[5] (Docket Entry # 14).

In 2010, the Charests "fell behind on their mortgage" because of medical expenses. (Docket Entry # 1–1, ¶¶ 20–21). As a result, GMAC, on behalf of Fannie Mae, offered "to consider [the Charests] for a loan modification" under RAMP. (Docket Entry # 1–1, ¶ 21). In a November 30, 2010 letter to GMAC, the Charests requested that all further communications from Fannie Mae and GMAC be directed to their attorney. (Docket Entry # 1–1, ¶ 50). Fannie Mae and GMAC "acknowledged receiving this request on December 10, 2010," and sent the Charests a letter stating that, " '[W]e updated our records to reflect you are represented by counsel.' " (Docket Entry # 1–1, ¶ 50). Notwithstanding this request, GMAC, on behalf of Fannie Mae, continued to send letters directly to the Charests in January, February and March 2011.[6] (Docket Entry # 1–1, ¶ 51).

In December 2010, the Charests submitted their first application to GMAC for a loan modification under RAMP. (Docket Entry # 1–1, ¶ 29). Under the RAMP servicing guide in effect at the relevant time,[7] a borrower is eligible "for a modification of a Fannie Mae owned loan under RAMP" if the financial documentation he provides "confirms that the monthly mortgage payment ratio prior to the modification is greater than 31 percent." *The Guide*, §§ 609.01, 610.03.05. Additional eligibility requirements dictate that the mortgage originate before January 1, 2009, and secure the borrower's "principal residence." *The Guide*, § 610.01. A borrower's "monthly mortgage payment ratio" is a "ratio of the borrower's current monthly mortgage payment to the borrower's monthly gross income." *The Guide*, § 609.03.05. During this time period, the Charests' monthly income was approximately $4,372. (Docket Entry # 1–1, ¶ 30). The complaint reasonably infers that the Charests' mortgage payments prior to modification exceeded 31% of their gross monthly income of $4,372 ($1,355).

After a servicer receives financial documents, the servicer must apply a number of steps to arrive at a monthly mortgage payment ratio that is "as close as possible to 31 percent." *The Guide*, § 610.03.06.[8]

---

5. As explained in the discussion section, these and other provisions provide the basis for an agency relationship between GMAC and Fannie Mae.

6. The complaint depicts the dates as "January, February, and March of 2010." (Docket Entry # 1–1, ¶ 51). The Charests' memorandum clarifies the dates as January, February and March 2011. (Docket Entry # 21, n. 3).

7. Fannie Mae 2010 Servicing Guide Update, Part VII and Part VIII (April 2010), https://www.efanniemae.com/singlefamily/servicing/2010 Servicing Guide (*"The Guide"*). The relevant sections in the foregoing 2010 servicing guide remained unchanged in the Fannie Mae 2011 Servicing Guide (June 10, 2011), https://www.efanniemae.com/singlefamily.

8. *The Guide* denotes these modification steps as the "Standard Modification Waterfall."

*The Guide*, § 610.03.06. These steps include capitalizing accrued interest; reducing the interest rate; if necessary, extending the term of the loan; and, if necessary, providing a principal forbearance. *The Guide*, § 610.03.06; see *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d at 557. Applying these steps, the servicer determines if the borrower's "monthly payment can be lawfully reduced to the target 31% of monthly income." *In re JPMorgan Chase Mortgage Modification Litigation*, 880 F.Supp.2d 220, 226 n. 7 (D.Mass.2012). The goal is to arrive at a " 'target monthly mortgage payment ratio' " which is "as close as possible but not less than 31%." *The Guide*, §§ 610, 610.03.06. Thereafter, the servicer applies a "net present value" or NPV test to assess "whether it is more profitable to modify the loan or allow the loan to go into foreclosure." *The Guide*, § 610.03.04; *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d at 557;

Here, "the Charests were eligible for a modification" and Fannie Mae could have reduced their monthly mortgage payment to 31% of their gross monthly income. (Docket Entry # 1–1, ¶¶ 30–31). Fannie Mae nevertheless denied the Charests a loan modification and informed them they "were not eligible." (Docket Entry # 1–1, ¶ 31).

The Charests submitted another application to GMAC in April 2011.[9] At the time, the Charests' monthly income was approximately $3,713. The complaint reasonably infers that the Charests' mortgage payments exceeded 31% of their gross monthly income of $3,713 ($1,151). Again, they "were eligible for a modification" and Fannie Mae could have reduced their monthly mortgage payment to 31% of their gross monthly income. (Docket Entry # 1–1, ¶¶ 30–31). Indeed, not only could Fannie Mae have reduced their monthly mortgage payment but it could have "reduced the amount of interest paid over the life of the loan." (Docket Entry # 1–1, ¶ 33). Fannie Mae nevertheless denied the Charests a loan modification and informed them they "were not eligible." (Docket Entry # 1–1, ¶ 31).

As one of the reasons to deny the loan modification, Fannie Mae advised the Charests that they did not live at the property. (Docket Entry # 1–1, ¶ 32). As previously indicated, eligibility for a loan modification under RAMP requires that "the mortgage loan" be secured by the "borrower's principal residence" and that the property "not be vacant or condemned." *The Guide*, § 610.01. The statement was incorrect because "the Charests have lived in their home continually since 1978." (Docket Entry # 1–1, ¶ 32).

In May 2011, GMAC, on behalf of Fannie Mae, stated that it would not allow a forbearance of the principal "as part of a loan modification." (Docket Entry # 1–1, ¶¶ 26, 28). As part of the standard waterfall procedure, however, "[i]f necessary, the servicer must provide for principal forbearance to achieve the target monthly mortgage payment ratio."[10] *The Guide*, § 610.03.06. "When later challenged on this misstatement, GMAC denied making it." (Docket Entry # 1–1, ¶ 28).

In July 2011, the Charests submitted a third application for a loan modification. (Docket Entry # 1–1, ¶ 34). The application contained all required documentation. (Docket Entry # 1–1, ¶ 34). In August 2011, GMAC, on behalf of Fannie Mae, denied the application for the stated rea-

*Markle v. HSBC Mortgage Corp. (USA)*, 844 F.Supp.2d 172, 177 (D.Mass.2011) (NPV assessment ascertains whether "expected cash flow from a modified loan would exceed the cash flow from the unmodified loan"). If the borrower "qualifies under these eligibility criteria, the guidelines direct the servicer to offer that individual a Trial Period Plan" or TPP for a designated time period. *Markle v. HSBC Mortgage Corp. (USA)*, 844 F.Supp.2d at 177; *see In re JPMorgan Chase Mortgage Modification Litigation*, 880 F.Supp.2d at 226 n. 7 (if "Waterfall calculation yields the monthly income target, and if the modification provides a net present benefit to the mortgage holder, the servicer must offer the borrower a TPP Agreement"). If the borrower complies with the TPP, he "will obtain a permanent modification at the end of the trial period." *Markle*

*v. HSBC Mortgage Corp. (USA)*, 844 F.Supp.2d at 177.

9. The complaint does not identify whether the Charests submitted the December or the April application to GMAC or to Fannie Mae. Typically, applications are submitted to and evaluated by the servicer. *The Guide*, § 610 ("Under [HAMP], servicers will use a uniform loan modification process to provide eligible borrowers with sustainable monthly payments"); *The Guide*, § 610.03.05 ("servicer may evaluate a borrower for HAMP only after the servicer receives the financial documentation . . . from the borrower").

10. See footnote eight.

son that the Charests had "insufficient income." (Docket Entry # 1–1, ¶ 36). The Charests' income however qualified them for a loan modification. (Docket Entry # 1–1, ¶ 36).

Throughout these loan applications, the Charests timely provided GMAC with the required loan documents requested by GMAC and Fannie Mae.[11] GMAC however incorrectly and repeatedly advised the Charests that the documentation was not complete. The requests resulted in delays in processing their loan modification applications causing them "to incur additional legal fees." (Docket Entry # 1–1, ¶ 43). For example, with respect to the December 2010 application, GMAC requested documents in January, March, April and May 2011 that the Charests previously provided. Similarly, with respect to the July 2011 application, GMAC, on behalf of Fannie Mae, requested bank statements. On July 16 and July 26, 2011, GMAC asked for copies of a profit and loss statement and a tax return. The Charests had previously provided these documents to GMAC. (Docket Entry # 1–1, ¶ 35).

At this time and in lieu of providing a loan modification under HAMP, Fannie Mae, through GMAC, offered the Charests an "in-house" loan modification that they could not afford.[12] (Docket Entry # 1–1, ¶ 37). In fact, the proposed modification increased their monthly mortgage payment by approximately $200. (Docket Entry # 1–1, ¶ 37). When the Charests asked GMAC for the income amounts Fannie Mae used to calculate the increased payment, "GMAC, on behalf of Fannie Mae, admitted that it had miscalculated the Charests' income." (Docket Entry # 1–1, ¶ 37). In particular, it mistakenly attributed $3,937 in monthly gross income to Paula M. Charest whereas the correct figure was $1,750. (Docket Entry # 1–1, ¶ 39). GMAC, on behalf of Fannie Mae, assured the Charests that it would send them a new, accurate payment amount. (Docket Entry # 1–1, ¶ 40).

A few weeks later, GMAC, on behalf of Fannie Mae, "informed the Charests that regardless of its own error, it would not provide them with the modification." (Docket Entry # 1–1, ¶ 41). GMAC also advised "the Charests that their debt-to-income ratio was too high." (Docket Entry # 1–1, ¶¶ 41–42). GMAC then resumed collection activities. (Docket Entry # 1–1, ¶ 41).

In an effort to reduce their debt-to-income ratio, the Charests filed for bankruptcy in January 2012. (Docket Entry # 1–1, ¶ 42). After the bankruptcy filing, Fannie Mae, through GMAC, again denied

---

11. Although not explicitly stated in the complaint, this court draws the reasonable inference in the Charests' favor that the documents were timely. *See The Guide,* §§ 610.03.03, 610.05.05 (requiring that documents supporting property's valuation and borrower's gross income not be more than 90 days old).

12. The complaint cites 940 C.M.R. § 8.06(15) as a basis to impose liability under chapter 93A. (Docket Entry # 1–1, ¶ 38). In pertinent part, this regulation states that:

(15) It is an unfair or deceptive act or practice for a mortgage broker to arrange or mortgage lender to make a mortgage loan unless the mortgage broker or lender, based on information known at the time the loan is made, reasonably believes at the time the loan is expected to be made that the borrower will be able to repay the loan based upon a consideration of the borrower's income, assets, obligations, employment status, credit history, and financial resources, not limited to the borrower's equity in the dwelling which secures repayment of the loan (subject, however, to the treatment of No Income Loan Products in 940 CMR 8.06(16)).

940 C.M.R. § 8.06(15).

them a loan modification.[13] (Docket Entry # 1–1, ¶ 42).

GMAC, on behalf of Fannie Mae, scheduled foreclosure sales of the property for January 13, 2011, May 16, 2011, June 1, 2011, and January 19, 2012. (Docket Entry # 1–1, ¶¶ 46–48). At these times, the Charests' applications for a RAMP loan modification "were under consideration." (Docket Entry # 1–1, ¶¶ 46, 48). RAMP guidelines dictate that, "servicers should not proceed with a foreclosure sale until the borrower has been evaluated for the program and, if eligible, an offer to participate in RAMP has been made." *The Guide*, § 610.04.04. There is no indication that a foreclosure sale took place. In fact, the complaint notes that a new servicer, Ocwen Loan Servicing, LLC ("Ocwen"), took over the servicing of the Charests' mortgage in February 2013. (Docket Entry # 1–1, ¶ 17).

 In May 2012, Residential Capital, LLC and certain of its affiliates, including GMAC, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. The filing triggered the automatic stay under 11 U.S.C. § 362(a).[14] In July 2012, the bankruptcy court issued a final supplemental order partially lifting the stay with respect to certain borrower foreclosure actions. (Docket Entry # 19–1, ¶ 14). In pertinent part, the order states that:

(a) except as set forth herein, a borrower, mortgagor, or lienholder (each an "Interested Party") shall be entitled to assert and prosecute direct claims and counter-claims relating exclusively to the property that is the subject of the loan owned or serviced by a Debtor for the purposes of defending . . . or precluding any foreclosure . . . ;

(b) absent further order of the Court, the automatic stay shall remain in full force and effect with respect to all pending and future Interested Party direct claims and counter-claims: (i) for monetary relief of any kind and of any nature against the Debtors, except where a monetary claim must be [pled] in order for an Interested Party to assert a claim to . . . preclude a foreclosure . . . ; (ii) for relief that if granted, would not terminate or preclude the prosecution and completion of a foreclosure. . . .

(Docket Entry # 19–1).

## DISCUSSION

Fannie Mae seeks to dismiss the chapter 93A claim because: (1) it did not engage in any unfair or deceptive acts or practices; (2) it is not liable for violating HAMP guidelines because they pertain to loan servicers; and (3) the purportedly unfair or deceptive acts did not cause the Charests any damages. Fannie Mae additionally seeks dismissal under Fed.R.Civ.P. 12(b)(7) ("Rule 12(b)(7)") for failure to join GMAC as "a necessary and indispensable party." (Docket Entry # 19).

As set out in the complaint and reiterated in the Charests' memorandum, Fannie Mae, though GMAC, purportedly violated chapter 93A because it: (1) misrepresented their eligibility for loan modifications; (2) intentionally miscalculated their income; (3) promised them a modification that it never provided; (4) repeatedly re-

---

13. Subject to certain exceptions, *The Guide* states that, "A borrower actively involved in a bankruptcy proceeding is eligible for RAMP *at the servicer's discretion." The Guide*, § 610.01 (emphasis added).

14. The automatic "stay ends when the bankruptcy estate is closed and the stay" does not apply "to property that has been removed from the estate." *In re Furlong*, 660 F.3d 81, 89 (1st Cir.2011) (citations omitted).

quested paperwork that the Charests already submitted; (5) circumvented the Charests' counsel and contacted them directly; and (6) "scheduled foreclosure sales while" the Charests' "applications were under review" for a modification. (Docket Entry # 1–1, ¶¶ 1, 23). The Charests maintain that Fannie Mae is vicariously liable for such chapter 93A violations because GMAC was Fannie Mae's agent. They further contend that GMAC is not "a necessary and indispensable party" under Fed.R.Civ.P. 19 ("Rule 19") because this court can award complete relief notwithstanding GMAC's absence.

## I. *Chapter 93A*

■■■ Addressing Fannie Mae's first argument entails examining GMAC's conduct under chapter 93A. Chapter 93A "proscribes 'unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.'" *Juarez v. Select Portfolio Servicing, Inc.*, 708 F.3d 269, 280 (1st Cir.2013) (quoting chapter 93A, section 2). "'A practice is unfair if it is within the penumbra of some common-law, statutory, or other established concept of unfairness; is immoral, unethical, oppressive, or unscrupulous; and causes substantial injury.'" *Young v. Wells Fargo Bank, N.A.*, 717 F.3d at 240 (chapter 93A claim alleging HAMP violations) (quoting *Linkage Corp. v. Trustees of Boston University*, 425 Mass. 1, 679 N.E.2d 191, 209 (1997)). The "crucial factors" in determining whether an act or practice is "unfair" are "the nature of [the] challenged conduct" as well as the "purpose and effect of that conduct." *Massachusetts Employers Ins. Exchange v. Propac–Mass, Inc.*, 420 Mass. 39, 648 N.E.2d 435, 438 (1995). A practice is deceptive "'if it "could reasonably be found to have caused a person to act differently from the way he or she otherwise would have acted." '" *Aspinall v. Philip Morris Compa-*

*nies, Inc.*, 442 Mass. 381, 813 N.E.2d 476, 486 (2004) (brackets omitted). Here, the alleged violations concern misrepresentations during the Charests' attempts to procure a loan modification under HAMP beginning in December 2010 and continuing until early 2012.

HAMP is a federal program "'that incentivizes lenders and loan servicers to offer loan modifications to eligible homeowners.'" *Wilson v. HSBC Mortgage Services, Inc.*, 744 F.3d 1, 6 (1st Cir.2014) (quoting *Young v. Wells Fargo Bank, N.A.*, 717 F.3d at 228). The "ultimate goal" of the program "is to encourage "'mortgage holders to renegotiate the loans in order to reduce a homeowner's mortgage payments to sustainable levels, without discharging any of the underlying debt.'"" *Id.* (quoting *Young v. Wells Fargo Bank, N.A.*, 717 F.3d at 228); *Orozco v. GMAC Mortgage, LLC*, 2012 WL 4581092, at *2 (D.Mass. Oct. 1, 2012) (HAMP's goal is to provide "relief to borrowers who have defaulted or are likely to default by reducing mortgage payments to sustainable levels, without discharging any of the underlying debt"). As noted previously, the servicing contract between Fannie Mae and GMAC incorporated "Fannie Mae's Guides to Lenders." (Docket Entry # 14, p. 22). *The Guide* in effect at the relevant time states that "servicers must participate in HAMP." *The Guide*, § 610.

■■■ Chapter 93A liability does not require the violation of a statute, let alone a guideline, to create liability. *See Young v. Wells Fargo Bank, N.A.*, 717 F.3d at 240 ("[v]iolation of a statute is not a necessary element of a Chapter 93A claim" inasmuch as the law "'creates new substantive rights and ... makes conduct unlawful which was not'" previously unlawful); *see also Okoye v. Bank of New York Mellon*, 2011 WL 3269686, at *7 (D.Mass. July 28,

2011) (noting, in context of chapter 93A claim, that HAMP guidelines are not statutes). "Conversely, violation of a statute does not automatically give rise to a Chapter 93A claim." *Morris v. BAC Home Loans Servicing, L.P.*, 775 F.Supp.2d 255, 259 (D.Mass.2011).

▆▆▆▆ HAMP guidelines impose a series of detailed obligations on participating servicers such as GMAC in processing an application for a loan modification.[15] These obligations include acknowledging receipt of the application in ten days and responding to it in 30 days,[16] requiring specific financial documents depending upon the borrower's employment status,[17] undertaking a series of loan modification steps with the goal of reducing the monthly mortgage payment ratio to 31%,[18] calculating the NPV in accordance with certain parameters[19] and including certain information in a denial notice to a borrower.[20] Consequently, "not every technical violation of HAMP should expose a servicer to Chapter 93A liability." *Morris v. BAC Home Loans Servicing, L.P.*, 775 F.Supp.2d at 263; *accord Bean v. Bank of New York Mellon*, 2012 WL 4103913, at *8 (D.Mass. Sept. 12, 2012) ("'more than mere technical violations and clerical errors' are required to support a Chapter 93A claim predicated on HAMP viola-

tions"). Thus, in *Morris*, the technical violation of the servicer's failure to respond to the borrowers within ten days of receiving their HAMP application and to complete the eligibility evaluation within the required 30 days did not violate chapter 93A. *Morris v. BAC Home Loans Servicing, L.P.*, 775 F.Supp.2d at 260, 263. Similarly, a "failure to modify a loan under HAMP, without more," does not "constitute a Chapter 93A violation." *Okoye v. Bank of New York Mellon*, 2011 WL 3269686, at *8.

In contrast, a bank's "history of being nonresponsive to the plaintiffs' efforts to obtain a loan modification" coupled with a prior effort that "yielded *higher* monthly payments, an error that [the bank] made little or no effort to fix," would satisfy the plausibility standard under Rule 12(b)(6). *Id.* at 263 (allowing plaintiffs leave to amend chapter 93A claim to set out facts to support allegation that servicer mishandled and unfairly disregarded application) (emphasis in original). Likewise, allegations that a bank's history of requiring a borrower to resubmit the same documents to support a HAMP loan modification coupled with repeatedly changing bank officials in charge of the requested modification and then closing the file on the pretext of an inability to contact the borrower survive a motion to

---

**15.** Footnote eight sets out the overall process that culminates in a TPP or eligibility denial notice.

**16.** *The Guide,* § 609.03.05.

**17.** *The Guide,* § 610.03.05.

**18.** "Servicers must apply the proposed modification steps enumerated below in the stated order of succession until the borrower's monthly mortgage payment ratio is reduced as close as possible to 31 percent." *The Guide,* § 610.03.06 (delineating "Standard Modification Waterfall").

**19.** As stated in *The Guide:*

All mortgage loans that meet the HAMP eligibility criteria must be evaluated using a standard NPV test for reporting purposes. The servicer must maintain detailed documentation of the NPV model and version used, all NPV inputs and assumptions, and the NPV results. If the value for the no-modification scenario exceeds the value for the modification scenario by more than $5,000, the servicer must not perform the modification without the express written consent of Fannie Mae.

*The Guide,* § 610.03.04.

**20.** *The Guide,* § 610.04.02.

dismiss a chapter 93A claim. *Kirtz v. Wells Fargo Bank N.A.,* 2012 WL 5989705, at *12 (D.Mass. Nov. 29, 2012).[21]

■ During the Charests' application processes, GMAC required unnecessary information and documents it already possessed, miscalculated Paula M. Charest's income, repeatedly misrepresented the Charests' eligibility for a loan modification and denied applications based on incorrect facts.[22] *See Bosque v. Wells Fargo Bank, N.A.,* 762 F.Supp.2d 342, 353–354 (D.Mass. 2011) (allegations that bank made misleading representations about plaintiffs' eligibility for permanent HAMP loan modification and plaintiffs' rights under HAMP sufficient to state chapter 93A claim). GMAC then offered the Charests an unaffordable "in-house" modification that increased their monthly mortgage payments. *See Morris v. BAC Home Loans Servicing, L.P.,* 775 F.Supp.2d at 263. Such allegations, supported as they are by facts in the complaint, survive a Rule 12(b)(6) motion.[23] As a final matter, allowing the Charests to recover under chapter 93A is compatible with the objectives and enforcement mechanisms of HAMP. *See Kozaryn v. Ocwen Loan Servicing, LLC,* 784 F.Supp.2d 100, 102 (D.Mass.2011) (collecting cases); *see, e.g., Morris v. BAC Home Loans Servicing, L.P.,* 775 F.Supp.2d at 259–260.

## II. *Agency*

Fannie Mae next seeks to dismiss the chapter 93A claim because it is not a servicer of the loan.[24] As such, HAMP guidelines do not apply to its conduct. The Charests submit that principles of agency provide a basis for liability.

An agency relationship arises from a " " 'manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.' " " *Eaton v.*

21. Although *Kirtz* also involved scheduling and conducting a foreclosure of the property, the court made the above finding prior to any discussion of the foreclosure as a chapter 93A violation. *See id.* at *13.

22. GMAC denied one application in part because the Charests did not reside in their home when, in fact, they had lived in the home since 1978. It denied another application due to insufficient income when, in fact, the Charests had sufficient income.

23. It is therefore not necessary to address whether scheduling a foreclosure sale, as opposed to proceeding with a foreclosure, provides support for a chapter 93A claim. The record indicates there was no foreclosure sale. *Cf. Kirtz v. Wells Fargo Bank N.A.,* 2012 WL 5989705, at *2, *13 (scheduling and conducting foreclosure while HAMP loan modification under review sufficiently sets out chapter 93A claim to avoid Rule 12(b)(6) dismissal); *Orozco v. GMAC Mortgage, LLC,* 2012 WL 4581092, at *1–5 (scheduling and then conducting foreclosure sale while HAMP loan modification under review sufficient to avoid Rule 12(b)(6) dismissal of chapter 93A claim); *see also Figueroa v. Federal Nat.*

Mortg. Ass'n, 2013 WL 2244348, at *5 (D.Mass. May 20, 2013) (merely alleging "that defendants foreclosed while her loan modification was pending is not enough to show unfairness or deception" under chapter 93A). It is equally unnecessary to address Fannie Mae and GMAC's contacts with the Charests while they were represented by counsel or the purportedly per se chapter 93A violation based on 940 C.M.R. § 806(15).

24. To support the argument, Fannie Mae cites, among other decisions, an unpublished Massachusetts Appeals Court case in the form of a Memorandum and Order under Rule 1:28, *Gregory v. Astoria Federal Savings & Loan Ass'n,* 83 Mass.App.Ct. 1138, 2013 WL 3213602 (Mass.App.Ct. June 27, 2013). Although this court has reviewed the case, it has no precedential value. *See Commonwealth v. Gray,* 80 Mass.App.Ct. 98, 951 N.E.2d 931, 935 (2011) (this case "well illustrates why our often conclusory decisions pursuant to rule 1:28 are not accorded precedential weight"); *see Chace v. Curran,* 71 Mass.App.Ct. 258, 881 N.E.2d 792, 795 n. 4 (2008).

*Federal Nat. Mortg. Ass'n,* 462 Mass. 569, 969 N.E.2d 1118, 1131 n. 25 (2012) (quoting *Harrison Conference Servs. of Mass., Inc. v. Commissioner of Revenue,* 394 Mass. 21, 474 N.E.2d 160, 162 (1985), quoting *Restatement (Second) of Agency* § 1(1) (1958)). Chapter 93A encompasses vicarious liability of a principal for the conduct of his agent even if the principal "was entirely unaware" of the conduct. *Kansallis Finance Ltd. v. Fern,* 421 Mass. 659, 659 N.E.2d 731, 738 (1996) (law partners liable under chapter 93A for each other's conduct); *see also Savers Property & Cas. Ins. Co. v. Admiral Ins. Agency, Inc.,* 61 Mass.App.Ct. 158, 807 N.E.2d 842, 850 (2004) (principal "liable for the tortious conduct of its agent, even where the principal has no knowledge of the agent's fraudulent scheme"). There is also "no applicable statutory language suggesting that the Legislature intended to proscribe application of general agency principles in the context of mortgage foreclosure sales." *Eaton v. Federal Nat. Mortg. Ass'n,* 969 N.E.2d at 1131.

The authority of an agent may be actual or apparent. *See Theos & Sons, Inc. v. Mack Trucks, Inc.,* 431 Mass. 736, 729 N.E.2d 1113, 1120 (2000) ("principal has liability for the agent's acts toward third parties only if the agent was acting with the actual or apparent authority of the principal in that transaction"). "Actual authority, either express or implied, is the agent's power to affect the principal's relations with third parties as manifested to the agent by the principal." *Id.* Apparent authority results through " 'written or spoken words or any other conduct of the principal which, reasonably interpreted, causes a third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him.' " *Licata v. GGNSC Malden Dexter LLC,* 466 Mass. 793, 801 (Mass.2014). Ordinarily, the existence of an agency relationship is "a question of fact for the jury . . . [t]o be determined from all the evidence and reasonable inferences to be drawn therefrom." *White's Farm Dairy, Inc. v. De Laval Separator Company,* 433 F.2d 63, 66 (1st Cir.1970); *Stern v. Lieberman,* 307 Mass. 77, 29 N.E.2d 839, 842 (1940) ("[p]roof of agency is ordinarily a question of fact").

Undeniably, HAMP guidelines encourage loan *servicers* as opposed to lenders to enter into loan modifications with eligible borrowers. *See Young v. Wells Fargo Bank, N.A.,* 717 F.3d at 228–229. Here, Fannie Mae is not a loan servicer and is not subject to the HAMP guidelines on the basis that it is a servicer. In the context of actual authority, however, "the agent acts as the extension of the will of his principal." *Kansallis Finance Ltd. v. Fern,* 659 N.E.2d at 734. "Typically, a mortgage servicer acts as the agent of the mortgagee to effect collection of payments on the mortgage loan." *R.G. Fin. Corp. v. Vergara–Nuñez,* 446 F.3d 178, 187 (1st Cir.2006) (internal bracket omitted). Viewing the facts in the Charests' favor, Fannie Mae owns the mortgage and, as such, has the authority to service the mortgage. It delegated that authority to GMAC. GMAC consented to act on behalf of Fannie Mae by entering into the servicing contract. Fannie Mae's liability is not imposed because it is the investor and owner of the mortgage. Rather, it is imposed based on the authorized conduct of GMAC, as the designated servicer and agent of Fannie Mae.

The Rule 12(b)(6) record contains additional facts that give rise to an agency relationship with respect to the servicing transactions and the misrepresentations at issue. Quoting the servicing contract between GMAC and Fannie Mae, it sets out "the basic rules governing the servicing of mortgages that we purchase" and the ser-

vicing duties of GMAC. (Docket Entry # 14, § V(A)). Those duties include servicing the mortgage according to RAMP guidelines. (Docket Entry # 14, § V(A)) ("Any mortgage serviced under this Contract, which we own ..., must be serviced by [GMAC] according to the provisions of our Guides"). GMAC's misrepresentations took place while it was servicing the Charests' mortgage and reviewing their loan applications under RAMP.

Although RAMP guidelines do not create a private right of action against the servicer or the lender, *see Kozaryn v. Ocwen Loan Servicing, LLC*, 784 F.Supp.2d at 102 ("RAMP does not provide a private cause of action") (collecting cases), they do provide a basis, under limited circumstances, to impose liability under chapter 93A against the servicer.[25] Construed in the Charests' favor, the facts in the complaint show that GMAC's conduct involved the duties and responsibilities Fannie Mae delegated to GMAC to service the mortgage owned by Fannie Mae. Whereas there may be other arguments that bar liability against Fannie Mae, the argument that Fannie Mae is not liable because it is neither a servicer nor a HAMP participant does not preclude chapter 93A liability based on agency under Rule 12(b)(6).

### III. *Damages*

Fannie Mae also argues that the Charests fail to show they suffered any injury or damages caused by the unfair or deceptive acts or practices. The Charests submit that they experienced "economic inju-

ry" as a result of Fannie Mae's conduct. (Docket Entry # 21).

Chapter 93A provides a "right of action to any person 'who has been injured by another person's use or employment of any method, act or practice declared to be unlawful" under the statute. *Hershenow v. Enterprise Rent–A–Car Company of Boston, Inc.*, 445 Mass. 790, 840 N.E.2d 526, 532 (2006); *Rule v. Fort Dodge Animal Health, Inc.*, 607 F.3d 250, 253 (1st Cir.2010) ("chapter 93A provides a cause of action for a plaintiff who 'has been injured' by 'unfair or deceptive acts or practices'") (quoting sections 9(1) and 2(a) with citations omitted). After surveying Massachusetts case law, the First Circuit in *Rule* concluded that, "the most recent" Massachusetts Supreme Judicial Court cases "appear to have returned to the notion that injury under chapter 93A means economic injury in the traditional sense." *Rule v. Fort Dodge Animal Health, Inc.*, 607 F.3d at 255. Examples of such injuries in the context of a chapter 93A claim based on mishandling a forbearance agreement and a borrower's attempts to obtain a permanent loan modification under HAMP include a loss of equity in the borrower's "home and damage to her credit and her ability to obtain loans or credit in the future" as well as an "increase in interest rates she will have to pay on any existing or future loans and credit card accounts." *Young v. Wells Fargo Bank, N.A.*, 717 F.3d at 241.[26]

▮▮▮ In the case at bar, the Charests filed for bankruptcy to satisfy GMAC's

---

**25.** As discussed in the previous section and succinctly explained by the court in *Okoye:*

> The few Chapter 93A claims that have survived motions to dismiss have alleged a pattern of misrepresentations, failure to correct detrimental errors, and/or dilatory conduct on the part of the servicer and/or

bank that the courts have found could amount to unfair or deceptive practices. *Okoye v. Bank of New York Mellon*, 2011 WL 3269686, at *9.

**26.** The defendant in *Young* represented to the court that "the foreclosure sale has not yet been scheduled." *Id.* at 231 n. 2.

requirement to reduce the amount of their debt even though their income met HAMP eligibility requirements. Notably, they incurred "thousands of dollars in costs and attorneys fees" as a result of GMAC's conduct. (Docket Entry # 1–1, ¶ 58). The delays by GMAC in processing the Charests' applications caused the Charests "to incur additional legal fees." (Docket Entry # 1–1, ¶ 43). Such injuries provide an adequate basis to avoid a Rule 12(b)(6) dismissal of the chapter 93A claim. *See Young v. Wells Fargo Bank, N.A.*, 717 F.3d at 241; *Bosque v. Wells Fargo Bank, N.A.*, 762 F.Supp.2d at 354 ("wrongful foreclosures, increased fees, costs incurred to avoid foreclosure [and] loss of opportunities to pursue refinancing or loss mitigation strategies" sufficient to allege chapter 93A "injury and causation").

## IV. *GMAC as Required Party*

Fannie Mae submits that GMAC is a required party within the meaning of Rule 19 and that joinder is not feasible. Fannie Mae therefore moves to dismiss this action under Rule 12(b)(7). The Charests maintain that Rule 19 does not require the joinder of a principal and its agent and that joint tortfeasors are not required parties under Rule 19.

 Rule 19 involves situations in which "a lawsuit is proceeding without a party whose interests are central to the suit." *Bacardi International Ltd. v. V. Suarez & Co., Inc.*, 719 F.3d 1, 9 (1st Cir.2013); *Picciotto v. Continental Casualty Co.*, 512 F.3d 9, 15 (1st Cir.2008). The analysis is "fact-bound and driven by the nature of the issues" in the case. *Bacardi International Ltd. v. V. Suarez & Co., Inc.*, 719 F.3d at 9–10. It also entails "a practical determination" based on factors that vary with each case, " 'some such

factors being substantive, some procedural, some compelling by themselves, and some subject to balancing against opposing interests.' " *Picciotto v. Continental Casualty Co.*, 512 F.3d at 16 (quoting *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 119, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968)). Overall, a court must consider the policies underlying Rule 19 in the course of the analysis. *Id.* at 15. Such policies include " 'the public interest in preventing multiple and repetitive litigation, the interest of the present parties in obtaining complete and effective relief in a single action, and the interest of absentees in avoiding the possible prejudicial effect of deciding the case without them.' " *Id.* (quoting *Acton Co. v. Bachman Foods, Inc.*, 668 F.2d 76, 78 (1st Cir.1982)).

As set out in the text of the rule, the analysis is threefold. First, the court determines if the absent party is a "required party" under Rule 19(a). Second, the court ascertains whether joinder of the required party "is feasible." Fed.R.Civ.P. 19(b). Third, if joinder of the required party is not feasible, the court undertakes an equitable balancing of certain factors to "determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed.R.Civ.P. 19(b). Succinctly stated, Rule 19:

> provides for the joinder of such "necessary" parties when feasible. It then provides for the dismissal of suits when the court determines that the joinder of the "necessary" parties is not feasible, but that they are, nonetheless, so "indispensable" that the suit must not be litigated without them.

*Picciotto v. Continental Casualty Co.*, 512 F.3d at 15 (quoting former Rule 19 prior to 2007 amendment).[27]

**27.** Rule 19 underwent certain stylistic changes effective December 1, 2007. *See Pic-*

Turning to the task, Rule 19(a) depicts three criteria, any one of which, if satisfied, results in deeming the absent party a "required party." *See id.* at 16 & n. 11. A "required party" is a party who:

(A) in that person's absence, the court cannot accord complete relief among existing parties; or

(B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

(i) as a practical matter impair or impede the person's ability to protect the interest; or

(ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed.R.Civ.P. 19(a)(1). Subsection (a)(1)(A) focuses on the ability to accord complete relief *"among those already parties"* in the suit. *Bacardi International Ltd. v. V. Suarez & Co., Inc.,* 719 F.3d at 10 (emphasis in original). The two alternative means to qualify as a "required party" in subsection (a)(1)(B) concern "protecting the interests of the absent party." *Id.*

■■■ Examining Rule 19(a)(1)(A) and as correctly pointed out by Fannie Mae, the facts revolve around the conduct of GMAC in servicing the Charests' mortgage. *See Z & B Enterprises, Inc. v. Tastee–Freez Intern., Inc.,* 162 Fed.Appx. 16, 19–20 (1st Cir.2006) ("virtually all of the affirmative

acts that caused harm to the Plaintiffs were done by ATF or JF," purported agents of the defendant in contract dispute).[28] GMAC purportedly made various misrepresentations during the processing of the HAMP applications and incorrectly applied HAMP guidelines with respect to the Charests' eligibility for a loan modification. Like the circumstances at issue in *Z & B,* in which the court found "required party" status, GMAC and its employees engaged in virtually all of the misconduct at issue.

Fannie Mae's reliance on *Z & B* because the court found "that *agents* were necessary parties under Fed.R.Civ.P. 19(a)" (Docket Entry # 19, p. 15) (emphasis added), however, is incorrect. The plaintiffs in *Z & B* did "not put forth any evidence of an agency relationship between" the defendant and the absent parties. *Id.* at 19; *see Scott v. First American Title Ins. Co.,* 2007 WL 1303004, at *2–3 (D.N.H. May 3, 2007) (distinguishing *Z & B* because "court did not find, as First American represents, that JF and ATF were necessary parties because they were Tastee–Freez's agents and were responsible for the actions that formed the basis of the plaintiffs' claims"). In contrast, the basis of liability here is the existence of a viable agency relationship between Fannie Mae and GMAC.

The First Circuit in *Z & B* also determined that it could not grant "complete relief" because the plaintiffs were seeking

---

*ciotto v. Continental Casualty Co.,* 512 F.3d at 14 n. 8 (noting that "substance of the rule has not changed"). "[T]he word 'required' replaced the word 'necessary' in subparagraph (a)." *Republic of Philippines v. Pimentel,* 553 U.S. 851, 855, 128 S.Ct. 2180, 171 L.Ed.2d 131 (2008). "[T]he word 'indispensable'" was deleted. *Id.* at 856, 128 S.Ct. 2180.

**28.** Although Fannie Mae cites and relies on *Z & B,* it is an unpublished decision that has no precedential value. *See Narragansett Indian Tribe v. Rhode Island,* 449 F.3d 16, 29 (1st

Cir.2006) (characterizing reliance on unpublished decision as "misplaced" because "the opinion has no precedential force"). This court therefore considers the *Z & B* decision for its persuasive value as opposed to its binding effect. *See* First Circuit Rule 32.1.0 (allowing citation of unpublished First Circuit opinions "regardless of the date of issuance" but considering such opinions "for their persuasive value" and "not as binding precedent").

a rescission of contracts they made with the two absent parties. *Id.* at 20–21. *Z & B* is therefore distinguishable because the Charests are not seeking to rescind a contract GMAC signed.

Rule 19(a)(1) implicates not only the relief afforded existing parties but also the public's interest "in avoiding repeated lawsuits on the same essential subject matter." Fed.R.Civ.P. 19, Advisory Committee Notes, 1996 Amendment (discussing subsection 19(a)(1)). The court in *Z & B* was primarily concerned with avoiding repeated lawsuits on the same subject matter. *Z & B Enterprises, Inc. v. Tastee–Freez Intern., Inc.*, 2006 WL 123775, at *4. Here, a second lawsuit on the same subject matter is unlikely. A future indemnity suit by Fannie Mae involves a different cause of action.[29] Furthermore, the unambiguous and broad language in the indemnity provision leaves little room for GMAC to avoid its indemnity obligation in the event the Charests recover against Fannie Mae.[30] A second suit by the Charests against GMAC would be more than likely subject to a bankruptcy discharge. *See Vil v. Poteau*, 2013 WL 3878741, at *7–10 (D.Mass. July 26, 2013). Hence, unlike the circumstances presented in *Z & B*, the public's interest in avoiding a repeated lawsuit is not significantly impacted in the event GMAC is not joined as a party in this suit.

■ Finally, the fact that Fannie Mae, if deemed liable, may seek indemnity against the absentee party, GMAC, does not deny the Charests complete relief. GMAC and Fannie Mae's joint liability does not affect the Charests' ability to obtain complete relief against Fannie Mae. For example, in *Austin v. Unarco Industries, Inc.*, 705 F.2d 1 (1st Cir.1983), the court explained that, if the plaintiff prevailed on appeal, "she will be able to assert her full claim against Raybestos, leaving Raybestos to proceed against Unarco for contribution." *Id.* at 5 (allowing appeal to proceed against Raybestos without Unarco). Because "Rule 19(a)(1) is concerned only with those who are already parties," the fact that an existing party's dispute with the absent party is left unresolved does not make the absent party a required party. *MasterCard International Inc. v. Visa International Service Association, Inc.*, 471 F.3d 377, 385 (2nd Cir.2006); *see Bacardi International Ltd. v. V. Suarez & Co., Inc.*, 719 F.3d at 10 (citing and quoting *MasterCard*, 471 F.3d at 385, in parenthetical for this principle). Here too, the Charests and Fannie Mae can fully resolve their dispute between each other without GMAC as a party.[31] The prejudice to Fannie Mae is addressed elsewhere and, in any event, does not alter the finding that GMAC is not a "required party" under Rule 19(a)(1)(A). *See Bacardi International Ltd. v. V. Suarez & Co., Inc.*, 719 F.3d at 10.

■ GMAC is also not a "required party" under Rule 19(a)(1)(B)(i). First,

---

**29.** When and if it accrues, the suit might also be subject to the automatic stay.

**30.** Under the servicing agreement, indemnity applies "against *all* losses, damages, judgments or legal expenses that result from [GMAC's] failure *in any way* to perform its services and duties ... according to this Contract or our Guides." (Docket Entry # 14, § V(D)) (emphasis added). Further, GMAC must meet its indemnity obligation "regardless of whether the suit, claim or proceeding" against Fannie Mae "has merit or not." (Docket Entry # 14, § V(D)). In the face of such unambiguous and broad language, GMAC has little, if any, bargaining position to force a settlement in the event Fannie Mae incurs chapter 93A liability.

**31.** GMAC's absence as a party does not prevent obtaining discovery from its former employees who processed the loan applications prior to the May 2012 bankruptcy filing.

GMAC has not claimed an interest in this suit by affidavit or otherwise. *See Bacardi Intern. Ltd. v. V. Suarez & Co., Inc.*, 719 F.3d at 12 ("BC could similarly have filed an affidavit with the district court or provided some notice that its interests would be impaired, but did not do so"). To the extent the automatic stay prevents GMAC from filing any such notice, GMAC could have filed a motion seeking relief from the stay for the purpose of notifying this court that it has an interest that would be impaired in this proceeding. *See generally Picciotto v. Continental Casualty Co.*, 512 F.3d at 17 (in making practical determination under Rule 19(a)(1)(B)(i), "court may draw reasonable, pragmatic inferences from the particular circumstances in the case").

In addition, "an absent party's interests cannot be harmed or impaired if they are identical to those of a present party." *Id.* (discussing *Pujol v. Shearson/Am. Express, Inc.*, 877 F.2d 132, 135 (1st Cir. 1989)). Fannie Mae and GMAC have virtually identical interests in avoiding chapter 93A liability. If present, GMAC, like Fannie Mae, would argue that it did not violate the HAMP guidelines and did not engage in any misrepresentations or miscalculate the Charests' income during the application processes.

■■■ Fannie Mae argues that GMAC's absence impairs its ability to settle a subsequent claim by the Charests. (Docket Entry # 19, § II(B)). Impairing an absent party's ability to settle another lawsuit undeniably constitutes a valid consideration in the Rule 19(a)(1)(B)(i) calculus. *Id.* ("[s]ettlement position is a valid consideration in the practical inquiry required by" Rule 19(a)(1)(B)(i)). Because Fannie Mae has virtually identical interests to those of GMAC, however, proceeding without GMAC does not impair or impede its ability to settle a future suit. *See Bacardi*

*Intern. Ltd. v. V. Suarez & Co., Inc.*, 719 F.3d at 11; *National Association of Chain Drug Stores v. New England Carpenters Health Benefits Fund*, 582 F.3d 30, 43–44 (1st Cir.2009) ("interests of the absent pharmacies and PBMs have been vigorously addressed by arguments and evidence from pharmacy interests who were and are present"); *cf. Picciotto v. Continental Casualty Co.*, 512 F.3d at 16.

Furthermore, what Fannie Mae fails to point out is that GMAC's May 2012 bankruptcy filing more than likely discharges any pre-petition suit by the Charests based on facts that occurred in 2010, 2011 and early 2012. *See Vil v. Poteau*, 2013 WL 3878741, at *7–10 (noting "general rule" that "debts that arose prior to the filing of the bankruptcy petition are eligible for discharge" and finding prior cause of action seeking equitable and monetary relief against debtor dischargeable). In light of the foregoing, disposing of this action in the absence of GMAC does not "as a practical matter impair or impede [GMAC's] ability to protect" its interest within the meaning of Rule 19(a)(1)(B).

Turning to the final means to establish "required party" status, subsection (B)(ii) contains the same modifying language as subsection (B)(i), to wit, that the "person claims an interest relating to the subject of the action." Fed.R.Civ.P. 19(a)(1)(B). Here again, GMAC did not file a notice or otherwise assert an interest relating to this action. *See Bacardi Intern. Ltd. v. V. Suarez & Co., Inc.*, 719 F.3d at 12.

■■■ Rule 19(a)(1)(B)(ii) also protects the existing parties against "inconsistent obligations," not inconsistent adjudications. *See id.* "Inconsistent obligations occur when a party is unable to comply with one court's order without breaching another court's order concerning the same incident." *Delgado v. Plaza Las Americas, Inc.*, 139 F.3d 1, 3 (1st Cir.1998);

accord *Bacardi Intern. Ltd. v. V. Suarez & Co., Inc.*, 719 F.3d at 12 (quoting *Delgado v. Plaza Las Americas, Inc.*, 139 F.3d at 3). "Inconsistent adjudications or results, by contrast, occur when a defendant successfully defends a claim in one forum, yet loses on another claim arising from the same incident in another forum." *Delgado v. Plaza Las Americas, Inc.*, 139 F.3d at 3; accord *Bacardi Intern. Ltd. v. V. Suarez & Co., Inc.*, 719 F.3d at 12 (quoting *Delgado v. Plaza Las Americas, Inc.*, 139 F.3d at 3). A risk to a defendant who, after successfully defending "against a party[,] may be found liable to another party in a subsequent action arising from the same incident" presents "a risk of inconsistent adjudications or results" and, as such, "does not necessitate joinder of all of the parties into one action" under Rule 19(a). *Delgado v. Plaza Las Americas, Inc.*, 139 F.3d at 3. The risk that Fannie Mae may not recover indemnity from GMAC in the event that the Charests succeed against Fannie Mae under chapter 93A therefore does not constitute a risk of inconsistent obligations.

In addition, "where two suits arising from the same incident involve different causes of action, defendants are not faced with the potential for double liability because separate suits have different consequences and different measures of damages." *Id.* This action and a future indemnity action involve different causes of action. Furthermore, the likelihood that Fannie Mae will lose an indemnity suit is extremely low because of the broad language in the indemnity provision. *See Bacardi Intern. Ltd. v. V. Suarez & Co., Inc.*, 719 F.3d at 13 (risk "there would be inconsistent results is low because of the deferential manner in

which the FAA requires arbitral awards to be reviewed"). Fannie Mae's ability to proceed with an indemnity suit against GMAC also requires lifting the automatic stay. In sum, GMAC is not a required party within the meaning of Rule 19(a).

■ Although this ends the matter, this court nevertheless addresses the remaining criteria to complete the record. With respect to feasibility, GMAC is presently subject to an automatic stay in the bankruptcy proceeding. The parties agree that the automatic stay makes a joinder of GMAC not feasible. (Docket Entry # 21, p. 15);[32] (Docket Entry # 19, pp. 14 & 16). Adhering to the parties' position, this court concludes that the joinder of GMAC is not feasible. *See Colorado First Const. Co. v. U.S. Dept. of Housing and Urban Development*, 2006 WL 355224, at *7 (D.Colo. Feb. 15, 2006) (bypassing discussion of feasibility because "parties agree that PVF, because of its status as a debtor in bankruptcy, cannot be joined"); accord *Dale v. Abeshaus*, 2013 WL 5379384, at *16 n. 78 (E.D.Pa. Sept. 26, 2013) ("joinder of the Schutt Corporate Entities is not feasible because the Schutt Corporate Entities are in bankruptcy and any proceedings against them are subject to an automatic stay"); *see also National Ass'n of Chain Drug Stores v. New England Carpenters Health Benefits Fund*, 582 F.3d at 43 (if absent pharmacies "were deemed necessary, most could not practically be joined in this or any other law suit because of their numerosity").

■ Because the joinder of GMAC, a required party, is not feasible, this court turns to "whether, in equity and good conscience, the action should proceed among the existing parties or should be dis-

---

**32.** The Charests acknowledge that, "GMAC cannot join this case because these claims for monetary relief are not permitted claims and would violate the automatic stay in its bankruptcy proceeding." (Docket Entry # 21, p. 15).

missed." Fed.R.Civ.P. 19(b). The inquiry requires considering the following factors:

(1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;

(2) the extent to which any prejudice could be lessened or avoided by:

(A) protective provisions in the judgment;

(B) shaping the relief; or

(C) other measures;

(3) whether a judgment rendered in the person's absence would be adequate; and

(4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Fed.R.Civ.P. 19(b). A court may also "take into account other considerations" if relevant to the "'equity and good conscience'" inquiry. *B. Fernandez & HNOS, Inc. v. Kellogg USA, Inc.*, 516 F.3d 18, 23 (1st Cir.2008). This "fact-intensive analysis" involves a "'balancing of competing interests'" that is "'steeped in pragmatic considerations.'" *In re Olympic Mills Corp.*, 477 F.3d 1, 9 (1st Cir.2007); *accord B. Fernandez & HNOS, Inc. v. Kellogg USA, Inc.*, 516 F.3d at 23.

Ordinarily, "joint tortfeasors are not considered indispensable parties under federal law."[33] *Austin v. Unarco Industries, Inc.*, 705 F.2d at 5 (collecting cases). As explained in *Austin*, "Whatever prejudice results to Raybestos from being forced to proceed without Unarco is simply that inherent in the principle of joint and several liability." *Id.* The same principle typically adheres to the agent/principal relationship. *See Pujol v. Shearson American Exp., Inc.*, 877 F.2d 132, 136–137 (1st Cir.1989); *Chassen v. Fidelity Nat. Financial, Inc.*, 2009 WL 4508581, at *4

(D.N.J. Nov. 16, 2009) ("'like joint tortfeasors, a principal and its agent are not necessarily indispensable parties to an action even if both were allegedly involved in the wrongful acts at issue'"); 7 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1623 (3rd ed.2013) ("joinder has not been required of principals and agents") (collecting cases). The absent party in *Pujol* "was not an indispensable party because '[a]ny agent will suffer some adverse consequences when his principal is held vicariously liable on account of the agent's conduct, but this is not a sufficient interest for finding the agent indispensable under Rule 19.'" *Pujol v. Shearson American Exp., Inc.*, 877 F.2d at 136.

In this case, the extent to which a judgment may prejudice the existing parties or GMAC is not substantial. The prejudice to GMAC is either insufficient, *see Pujol v. Shearson American Exp., Inc.*, 877 F.2d at 136, or inherent in the principle of joint and several liability, *see Austin v. Unarco Industries, Inc.*, 705 F.2d at 5. At present, GMAC is also subject to the automatic stay in the event Fannie Mae seeks indemnity from GMAC due to an adverse judgment in this action.

Fannie Mae submits that GMAC's wrongdoing is the basis for the Charests' suit which results in prejudice to GMAC "by an adjudication of its conduct while it was not a party." (Docket Entry # 19, p. 17). It is true that GMAC's conduct forms the primary basis to impose liability on Fannie Mae which, in turn, may support a finding that GMAC is indispensable. *See H.D. Corp. of Puerto Rico v. Ford Motor Co.*, 791 F.2d 987, 993 (1st Cir.1986) (Ford has "substantial interest in the outcome of the dispute" and "plaintiffs' commonwealth law claims are largely directed against" it);

---

**33.** As previously noted, the current rule eliminates the term "indispensable party."

*see also In re Olympic Mills Corp.*, 477 F.3d at 10 (citing *Acton,* 668 F.2d at 77–78, in discussing Rule 19(b) analysis with parenthetical that "nondiverse parent corporation was indispensable" party because it "played a substantial role in negotiating both agreements, and stood to lose a substantial deposit"). Fannie Mae's aligned interest with GMAC's interest and its vigorous advocacy to date in this suit reduces the likelihood of an adverse judgment to Fannie Mae and, as a result, a future indemnity suit against GMAC in the event the stay is lifted. *See Marvel Characters, Inc. v. Kirby,* 726 F.3d 119, 134 (2nd Cir. 2013) ("potential prejudice to an absent party under Rule 19(b) is mitigated where a remaining party 'could champion his or her interest' ") (internal brackets omitted). These considerations diminish the likelihood of a plaintiff favorable judgment in this action that might prejudice GMAC. In addition, because GMAC's bankruptcy filing more than likely precludes a future suit by the Charests against GMAC, rendering a judgment without GMAC does not increase the prejudice to GMAC due to any negative impact on GMAC's bargaining position in settlement regarding a future suit by the Charests.

Fannie Mae also maintains that GMAC is prejudiced because Fannie Mae "could terminate its contract with GMAC." (Docket Entry # 19, p. 17). Ocwen is the current servicer of the Charests' mortgage. (Docket Entry # 1–1, ¶ 17). As such, there is no contract regarding the servicing of the Charests' mortgage to terminate. In fact, all servicing rights of Fannie Mae owned mortgages previously handled by GMAC transferred to Ocwen no later than February 2013. (Docket Entry # 1–1, ¶ 17); *see In re Residential*

*Capital, LLC,* No. 12–12020 (Bankr. S.D.N.Y. Nov. 21, 2012) (Docket Entry # 2246).

As to the existence of prejudice to the existing parties if a judgment were to render in GMAC's absence, the Charests may obtain injunctive relief in the absence of GMAC because Fannie Mae is the lender and Ocwen is now the servicer that would process any future HAMP loan modification application. *See generally In re Olympic Mills Corp.*, 477 F.3d at 10–11 (plaintiff's request for injunctive relief to rescind contract to which absent party was signatory "heavily" favors characterizing absent party as indispensable). GMAC's bankruptcy filing likely bars any direct action against GMAC on the part of the Charests.

■ Rule 19(b) also implicates "the defendant's interest in avoiding multiple litigation, inconsistent relief, or sole responsibility for a liability it shares with another." *In re Olympic Mills Corp.*, 477 F.3d at 9. As to Fannie Mae, a judgment rendered in GMAC's absence does not subject it to multiple liability or, as previously discussed, inconsistent obligations. Although Fannie Mae may share full responsibility for GMAC's conduct if it cannot later recover indemnity, Fannie Mae can guard against that result by vigorously pursuing its defenses in this action. The relatively limited kinds of chapter 93A suits that survive motions to dismiss where, as here, the misconduct involves HAMP guidelines and loan applications, *see Okoye v. Bank of New York Mellon,* 2011 WL 3269686, at *9, also reduces the likelihood that Fannie Mae will incur sole liability.[34] *See Bacardi Intern. Ltd. v. V. Suarez & Co., Inc.,* 719 F.3d at 13 ("Rule 19 inquiry may require 'some preliminary assessment of the mer-

**34.** This practical consideration is made *solely* with respect to the Rule 12(b)(7) motion. It does not forecast future relief or constitute a

finding on the merits of the chapter 93A claim.

its of certain claims' ") (quoting *Republic of Philippines v. Pimentel,* 553 U.S. at 869, 128 S.Ct. 2180).

With respect to Rule 19(b)(2), limiting relief provides a basis to lessen the prejudice. *See B. Fernandez & Hnos., Inc. v. Kellogg USA, Inc.,* 440 F.3d 541, 547 (1st Cir.2006). In the case at bar, tailoring the chapter 93A relief would not reduce the foregoing prejudice, which, in any event, is not substantial.

▮ The third factor "encompasses 'the interest of the courts and the public in complete, consistent, and efficient settlement of controversies.' " *Picciotto v. Continental Cas. Co.,* 512 F.3d at 18 (quoting *Provident Tradesmens Bank,* 390 U.S. at 111, 88 S.Ct. 733); *see B. Fernandez & HNOS, Inc. v. Kellogg USA, Inc.,* 516 F.3d at 25 ("judgment is 'adequate' " under Rule 19(b)(3) "if it furthers the public interest in 'complete, consistent, and efficient' resolution of controversies"); *In re Olympic Mills Corp.,* 477 F.3d at 9 (absent party not indispensable due in part to "completely different" causes of action in the two proceedings). The chapter 93A suit involves a different cause of action than a future indemnity suit in the event the Charests recover and the automatic stay is lifted. Accordingly, there is little, if any, risk of inconsistency. For the same reason, an efficient settlement of any such future suit is not significantly impacted by a judgment rendered without GMAC as a party. Although the two suits overlap factually because they involve GMAC's conduct in processing the Charests' loan applications, the legal issues in an indemnity suit concern the reach and scope of the language in the indemnity provision and the intent of the contracting parties. *See MacGlashing v. Dunlop Equipment Co.,*

*Inc.,* 89 F.3d 932, 940–941 (1st Cir.1996); *see generally Riva v. Ashland, Inc.,* 2013 WL 1222393, at *9 (D.Mass. March 26, 2013). There is little possibility of inconsistent judgments. *Cf. B. Fernandez & HNOS, Inc. v. Kellogg USA, Inc.,* 516 F.3d at 26 (proceeding without absent party "would unnecessarily create the possibility of inconsistent judgments").

The fourth factor encompasses considering "whether there is any assurance that the plaintiff, if dismissed, could sue effectively in another forum where better joinder would be possible." Fed.R.Civ.P. 19, Advisory Committee Notes, 1966 Amendment. Fannie Mae argues that plaintiff has an adequate remedy because "the U.S. Department of Treasury and/or FNMA *could* file suit [35] against GMAC for specific performance of contractual obligations relating to HAMP violations" and "these lawsuits will address GMAC's conduct which Plaintiffs claim violates M.G.L. c. 93A." (Docket Entry # 19) (emphasis added). Such a suit is not an adequate remedy because it would not compensate the Charests for the "additional legal fees" and "thousands of dollars in costs and attorney fees" (Docket Entry # 1–1, ¶¶ 43, 58) they incurred purportedly as a result of GMAC's misconduct. It is also not clear whether the Charests could join in any such suit. The Charests are therefore correct that they do not have an adequate remedy if this case is dismissed due to the absence of GMAC. Accordingly, the fourth factor weighs heavily in favor of proceeding in this action without GMAC.

Balancing the four factors and finding no other concern relevant to the analysis, "in equity and good conscience," Rule 19(b), this suit should proceed among the

---

**35.** Given this language, Fannie Mae fails to attest or even represent that it will file such a suit.

existing parties notwithstanding the absence of GMAC.

*CONCLUSION*

In accordance with the foregoing discussion, the motion to dismiss (Docket Entry # 18) is **DENIED.**